426 So.2d 111 (1983)
Brownie Reed HEBERT
v.
GULF STATES UTILITIES COMPANY, et al.
No. 81-C-0544, 81-C-0557.
Supreme Court of Louisiana.
January 10, 1983.
Rehearing Denied February 11, 1983.
Vance R. Andrus, Andrus & Preis, Lafayette, for applicant in No. 81-C-0544.
W.L. Wilson, Taylor, Porter, Brooks & Phillips, Ben L. Guelfo, Pete Diazzio, Watson, Blanche, Wilson & Posner, Baton Rouge, for respondents in No. 81-C-0544.
Ben L. Guelfo, Pete Diazzio, Watson, Blanche, Wilson & Posner, Baton Rouge, for applicant in No. 81-C-0557.
W.L. Wilson, Taylor, Porter, Brooks & Phillips, Baton Rouge, Vance R. Andrus, *112 Andrus & Preis, Lafayette, for respondents in No. 81-C-0557.
CALOGERO, Justice.
We are presented in this case for the first time following our decision in Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982) the need to review a case involving injuries to a worker who made contact with electrical transmission lines. The facts involved in this case are distinctly different from those involved in Kent. For the reasons which follow, we find merit in the plaintiff's position and reverse the judgment of the district court and the Court of Appeal.
The petitioner, employed by Southern Structures, Inc. to erect a metal building for Kelly R. Parrino in a Baton Rouge industrial park, was injured when a twenty foot piece of angle iron he was holding contacted a power line owned and maintained by the defendant, Gulf States Utilities Company.[1] A jury verdict was returned favorable to the utility company. The First Circuit Court of Appeal affirmed the judgment of the lower court. Hebert v. Gulf States Utilities, 395 So.2d 832 (La.App. 1st Cir.1981). In this Court, plaintiff urges three assignments of error: (1) The Court of Appeal erred in failing to consider the legal duty and liability of Gulf States Utility Company; (2) The Court of Appeal erred in applying a contributory negligence standard to the activities of the plaintiff/victim; (3) the trial court gave erroneous jury instructions.
Because we agree that the trial jury and the appellate court neglected to weigh properly the respective legal duties of the worker and the utility company in this electrocution case, we reverse the rulings of the lower courts, render judgment in favor of the plaintiff and remand the cases to the district court for a determination of damages.
To put the facts of this litigation in proper perspective, we begin a narration of events some time before the accident which severely injured the plaintiff, Brownie Reed Hebert.
Plaintiff had been trained as an iron worker and employed in the construction of metal buildings for Southern Structures for one and a half years before the accident, during which time he was promoted to "pusher" (foreman of a crew). He had participated in the construction of approximately twenty such metal buildings. These buildings were erected by first constructing a metal skeleton and then fastening metal wall and roof sheets to the skeleton. The property on which this particular metal building was constructed is part of an industrial park in Baton Rouge and was located between the last and the second to last electric utility poles on a distribution line for businesses in the vicinity. The rear of the slab on which the building was to be erected backed directly onto a servitude which contained four overhead electrical lines: three of them were energized with 7,620 volts of electricity; the fourth, above and to the middle of the other three, was neutral. A company spokesperson testified later at the trial that the lines were insulated by "isolation, by elevation," since they were "out of the practical reach of people." While the lines were 26.4 feet from the ground, the line nearest the proposed building was horizontally only 3.45 feet away, vertically only 9.5 feet away and diagonally a little more than ten feet from the highest point of the metal skeleton of the building. Such distances conformed to the national standards for the industry at the time the electrical line was constructed, although they are inadequate according to today's standards.[2]
*113 Four days before the accident which resulted in the injury, Brownie Hebert contacted these utility lines with a crane that he was using to transport metal sheets from the front to the rear of the slab where they were to be attached as walls of the building. No one was injured on that occasion but electric service to the area was interrupted. With the interruption, Mr. T. Otis McKnight, special legal investigator for Gulf States Utilities, came to the construction site and remained until the job requiring use of the crane was completed. Electricity was then restored to the overhead lines on the servitude behind the construction site.
It was four days later on the following Monday that Hebert sustained the severe injuries which touched off this litigation. That morning he had to place and secure a twenty foot metal fascial angle[3] on the top outside rear of the building. This twenty foot metal beam was leaning vertically inside the building's shell against the horizontal rafters of the rear end wall closest to the utility's right of way. Facing the inside of the partially constructed building, Hebert was perched on the wobbly metal end wall rafter almost sixteen feet from the concrete floor of the building, with his feet on either side of one of the metal roof purlins[4] and his back to the power lines. He pulled up the twenty foot angle iron hand over hand until he had it and himself balanced with about ten feet of the metal on each side of him. To place the metal fascial angle perpendicularly over the ends of the roof purlins, Hebert had to turn himself and the metal beam around to face the outside of the building. A co-worker was at one end of the wall rafter waiting to help screw the beam in place once Hebert was to have put it in place atop the purlins. With Hebert's twisting the twenty foot piece of metal counterclockwise, it came in contact with the innermost electrical wire. The electrical charge burned Hebert's hands and feet. He was thrown to the ground.[5]
The jury by a nine to three vote returned a verdict in favor of the defendant. The questions posed to the jury were: "(1) Do you find in favor of the plaintiff, Brownie Reed Hebert? (2) Do you find in favor of the defendant, Gulf States Utilities? (3) If the answer to # 1 is Yes, what amount do you award the plaintiff?" The jury merely answered # 2 in the affirmative. Thus the jury's answer to the court's interrogatories did not reveal whether their verdict in favor of Gulf States Utilities was because of an absence of fault on the part of the utility company or because of plaintiff's contributory negligence notwithstanding Gulf States' fault.
One of plaintiff's arguments on appeal was that Gulf States was negligent and that the jury erred in finding otherwise. The Court of Appeal pretermitted this issue of Gulf States' fault and focused instead upon plaintiff fault which would, if found, bar recovery in any event. Hebert, supra at 834.
*114 An appropriate resolution of this case on appeal does indeed entail a two fold inquiry. The first, relative to Gulf States and their fault, is whether the scope of their duty to protect against hazards in the transmission of electricity over high power lines encompassed the risk of harm encountered by this plaintiff, and, if so, whether Gulf States breached a duty owed to this plaintiff. The second incidental inquiry, assuming fault on the part of the utility, is whether this plaintiff is to be barred by his own contributory negligence.
We have just recently had occasion to consider the principles of tort liability which apply when injury occurs as a result of contact with overhead power lines. In Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982), a majority of this Court rejected the suggestion that absolute liability be imposed upon the utility company.[6] Likewise, because of the utility's actual knowledge of the condition of the lines, the Court found it unnecessary to impose strict liability. Kent, supra at 498. Rather in the case of an electrocution, we apply the principles of negligence and assess the liability of the various parties to the accident under a duty-risk analysis.
In deciding in favor of the utility in Kent, however, because of the peculiar and unusual facts of that case, we did not intend to diminish in any way the high degree of care that Louisiana courts have required of those who deal in the manufacture and distribution of electricity. See generally: Stone, Tort Doctrine § 395 in 12 Louisiana Civil Law Treatise 519.
Electric transmission companies which maintain and employ high power lines are required to exercise the utmost care to reduce hazards to life as far as practicable. Simon v. Southwest La. Elec. Membership, 390 So.2d 1265 (La.1980); Nessmith v. Central La. Electric Co., 257 So.2d 744 (La.App. 3d Cir.), writ denied, 261 La. 480, 259 So.2d 921, 922 (1972). However, an electric utility is not required to guard against situations which cannot reasonably be expected or contemplated. Simon, supra.
In Simon and in Kent, a majority of the Court found that the accident in each case could not reasonably have been anticipated. It was not within the scope of the duty owed by the defendant utilities to the injured plaintiffs, because there was no ease of association between the risk presented by the utilities' conduct under the overall circumstances and the resulting injuries. Hall v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972).
One of the two Simon decedents was fatally shocked when a forty-two foot drilling pipe he was removing at ground level from a well hole touched an overhead power line 26.7 feet above the ground. The second decedent succumbed to shocks sustained in trying to rescue the first by picking up the drilling pipe with his hands. In Kent, the accident occurred when the thirty foot aluminum pole the victim was using in an unorthodox fashion[7] to texture the surface *115 of a roadway came in contact with an overhead high voltage distribution line.
Here the facts are distinctly different. Unlike Kent where there were involved workers, construction supervisors, the highway department and the utility company, only two parties in this case essentially could have prevented this accident: the utility company and the busy workman, Hebert. Furthermore this accident occurred in an industrial park where the construction of metal buildings was commonplace. In fact earlier the same year, on or about January 19, 1977, another worker had been injured by coming in contact with the high voltage line while installing roof purlins for a metal building in the same industrial park. The means and methods of construction on the Parrino site were customary for the industry and those usually employed by Southern Structures and the plaintiff Hebert. Moreover, the risk is different for one assigned to work fifteen feet above the ground and atop a structure which is within ten or eleven feet of the power line, than for ground level workers who must use extraordinary means to contact the overhead electrical lines. Therefore the risk that an iron worker placing a twenty foot metal fascial angle on the top outside of a metal building will be injured by electrocution by inadvertently touching a power line at most only eleven diagonal feet away from his work place comes within the scope of the utility's duty to exercise the utmost care to reduce hazards to life as far as practicable. The duty of the defendant electrical utility was meant to protect this plaintiff worker from this type of harm (electrocution) arising in this manner (constructing a metal building in an industrial park).
Did Gulf States Utilities breach their duty to Brownie Reed Hebert? The three-fold duty of the utility in cases where injury is easily associated with the transmission of electricity over high power lines, as set forth in Simon, supra, is (1) to insulate the lines, or (2) to warn adequately of the danger, or (3) to take other proper and reasonable precautions to prevent injury. Gulf States Utilities maintains that the power lines were properly insulated and that Hebert was adequately warned of the dangers so that other precautions against injury were not necessary. Their argument is not convincing.
The lines, according to the defendant utility, were "insulated by isolation." Isolation in this sense means that the lines because of their location were not readily accessible to people. The lines were suspended 26'4" from the ground, with a horizontal and vertical clearance of 3.45' and 9.5' respectively from the nearest part of the building. These distances satisfied the minimum industry requirements when the lines were erected. [The distances have subsequently been increased, so that such clearances are no longer in compliance. See note 2, supra] However mere compliance with safety standards does not, per se, relieve the utility of negligence. Simon, supra; McKowen v. Gulf States Utilities Co., 358 So. 2d 675 (La.App. 1st Cir.1978).
In proper perspective, the power line was only about four feet above and three feet away from the head of a six foot worker standing, as was Hebert, on top of the end wall rafter. Furthermore these national standards are for already constructed solid wall buildings without windows facing the servitude. That margin of safety is a far cry from that needed for a building under construction. The construction of a building involves, as in this case, an ongoing work site with workers and activity above, below and around the skeleton of the building. The national clearance standards for an already completed solid wall structure without a window facing the servitude can hardly render solace to the utility in the case of an industrial accident resulting from the construction of the building itself. Additional *116 inquiry must be made concerning the actual continuing effectiveness of the insulation.
Insulation by isolation is maintained until something intervenes. Just as time, climate, blows or other circumstances may deteriorate rubber insulation coating a wire, so insulation by isolation may deteriorate with a changing environment. In this case after the construction of the power lines and with the advent of the construction of the metal building, the potential existed for the deterioration of the insulation by isolation. Then, such a deterioration or invasion of the insulation by isolation actually occurred in this case and was brought to the utility's attention when, four days before the accident resulting in injury, a crane in use on the construction site hit and knocked out service temporarily. Thus the defendant utility had specific knowledge of the risk of harm attending work at this construction site. At that point the utility could no longer fulfill its duty by maintaining the status quo and those protective measures which had previously been deemed sufficient to avoid accidents at this work place. Their duty then was to take reasonable measures to assure that workers legitimately in the area were able to work without unreasonable risk of harm.
The defendant contends that their conservative response of shutting down the electricity until work with the crane was completed and of warning the plaintiff Hebert and receiving his assurance that there would be no further problems with the crane, were sufficient to absolve them of any responsibility thereafter for injuries resulting from accidental contact with the lines. We do not agree that the utility company's response was adequate. It should have been evident even after the crane use was completed that the workers in the incipient stages of building construction would need to push and lift structural sections of metal in close proximity to the high voltage power lines.
McKnight, an accident investigator and safety supervisor for thirty-four years and the utility's representative at the accident site, had the professional background and years of experience with electricity to assess realistically the potential hazards of the situation given the type of buildings, the fact that the building was under construction at an incipient stage, and the proximity of the building frame to the high power line.
Therefore, the defendant utility company was in the better position to avert the consequences of an electrical accident on the job and should have taken other proper and reasonable precautions to prevent injury. At trial, experts differed over the ease with which the preventive options could have been implemented. Four not unrealistic possibilities, however, included: de-energizing the entire line adjacent to the construction site, de-energizing the two nearest lines and feeding the transformer from the line most distant from the construction; re-routing the energy supply so as to service other customers from the opposite end and de-energizing the span immediately adjacent to the work site; and placing temporary insulation similar to rubber hoses or snakes on the line. The utility company unquestionably had it within their power to make the site a safer place at which to work. It was the utility company which had the greater options, the greater knowledge, the direct control over the source of injury.
Hebert on the other hand, had no control over the transmission of the electricity despite a defense contention that he could have requested that the power be turned off while the job was completed. To expect Hebert to have so requested is unrealistic, given his position only as a work crew pusher for the construction company and considering that the Gulf States' safety inspector himself re-energized those lines upon conclusion of the crane's use at the construction site.
The defense argues additionally that there was a safer way to raise the twenty foot metal fascial angle.[8] It is difficult for *117 us to perceive of any really safe method of raising a twenty foot beam for horizontal installation on the exterior of a building, ultimately to be placed within little more than three horizontal feet and nine vertical feet of an electrical line. In any event to impose that burden on this plaintiff when the removability of the hazard is so obviously within the power of the utility company is unrealistic.
In assessing negligence and contributory negligence in a particular case, we do not necessarily require identical conduct of the plaintiff and the defendant. "Varying factors affect what the standard of the reasonable man requires. For example, the defendant may have had more information than the plaintiff concerning the risk involved..." Hall v. Hartford Accident & Indemnity Co., 278 So.2d 795 (La.App. 4th Cir.), writ denied, 281 So.2d 753 (La.1973). See also: Canter v. Koehring, 283 So.2d 716 at 728 (La.App. 4th Cir.1973), writ refused, 260 La. 857, 257 So.2d 432 (1972); Helminger v. Cook Paint and Varnish Co., 230 So.2d 623, at 628-29 (La.App. 3d Cir.1970); Allien v. Louisiana Power and Light Co., 202 So.2d 704 (La.App. 3d Cir.), cert. denied, 251 La. 392, 204 So.2d 574 (1967). We find therefore that the defendant utility company owed the plaintiff Hebert a duty to protect him from the risk of harm from electrocution and that the defendant utility breached that duty.
Did plaintiff's conduct preclude his recovery? Working near electrical power lines is neither contributory negligence per se nor assumption of the risk. Likewise the fact that a person's own actions bring him in contact with high voltage wires does not necessarily make him negligent. The question, as enunciated in Dyson v. Gulf Modular Corporation, 338 So.2d 1385 at 1390 (La. 1976) is whether "the party's conduct conform[ed] to the standard of care that would be exercised by a reasonable man; or did the conduct breach a duty imposed upon the party to protect against the particular risk from which the accident resulted?" In other words, did the plaintiff Hebert breach a duty to himself by failing to avoid the unreasonable risk created by the defendant utility company? We find that he did not.
Hebert had no part in deciding where to locate the metal building. No attempt was made by his superiors or the utility company to minimize the dangers of electrocution. His alternatives were "to try to tell his superior[s] how to run the job or to quit." Tirante v. Gulf States Utilities Co., 412 So.2d 128 at 133 (La.App. 4th Cir.) writ denied, 414 So.2d 389 (La.1982) quoting Chaney v. Brupbacher, 242 So.2d 627 at 631 (La.App. 4th Cir.1970). As discussed earlier, the method used to raise the angle iron was not unorthodox and had been effectively and efficiently used in the past without unfortunate incident. The beam on which Hebert was standing was unsteady, in large part because the fascial angle that Hebert was attempting to position was not yet screwed in place. Nor had the wall sheets been installed. The unsteadiness of the end wall rafter, then, made it difficult to balance, and Hebert was, in effect, attempting to use the angle iron itself in part to maintain his balance by holding it in the middle with ten feet to either side of his hands and body. It is evident from the testimony that Hebert was concentrating on keeping his balance. Therefore while he was generally aware of the danger of working around electrical power lines, he was not specifically aware of the immediate danger presented *118 when he tried to turn the angle iron around. Obviously had he known that the angle iron would touch the line energized with 7620 volts of electricity he would have done otherwise. The fact that the far end did indeed touch the power line does not preclude his recovery for the injuries he sustained.
As aptly stated in Hall, supra at 799:
When the party charged with the responsibility of observing safety factors fails to do so, it is grossly unjust to place the blame for a resulting accident on the person who poured the last cup of water before the defective dam broke, unless that person also exercised a substantial amount of knowledgeable control over the dangerous situation. There was no such knowledge or control by plaintiff in the present case.
Therefore Hebert's actions should not have barred his recovery for injuries sustained in this work accident. The jury was clearly wrong. In so finding, we are not oblivious to the deference that should be given the determination of the district court. Canter v. Koehring, 283 So.2d 716 (La.1973). Nonetheless the constitutional scope of review of the Supreme Court in civil cases extends to both law and facts. La. Const. art. 5 § 5(C). In the instant case, we give less credence to the outcome in the district court because the jury charges given probably contributed to the result favorable to the defense. Those instructions did not include a significant legal principle which, as evident from this opinion, was especially relevant to the jury's proper consideration of the varying elements of responsibility between the utility company and the plaintiff workman. Plaintiff requested a specific jury instruction based upon the Hall case (to which reference has earlier been made in this opinion) and the standards for assessing negligence and contributory negligence in situations involving industrial safety. The judge refused, contending that the import of the requested charge was included in his general instruction. It was not.

Decree
For the foregoing reasons, the judgments of the lower courts is reversed; the case is remanded for the determination of damages.
REVERSED AND REMANDED.
DIXON, C.J., concurs.
WATSON, J., concurs in the result.
MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting).
I am unable to say that the jury verdict in favor of Gulf States in this factual case was clearly wrong. Accordingly, I respectfully dissent.
NOTES
[1] Suit was originally brought also against Kelly R. Parrino, the owner of the property on which the building was constructed. The district court granted his motion for summary judgment. The Court of Appeal affirmed because of the exclusiveness of the workers' compensation remedy. Hebert v. Gulf States Utilities Co., 369 So.2d 1104 (La.App. 1st Cir.), writ denied, 369 So.2d 466 (La. 1979).
[2] According to Otis McKnight of Gulf States Utilities, the electric line in question was built in 1967 under the 1961 National Electrical Safety Code. The minimum horizontal and vertical clearance requirements for electrical lines adjacent to buildings under the 1961 Code were three feet and five feet respectively. The 1971 National Electrical Safety Code changed the minimum requirement for new construction and reconstruction to three feet and eight feet. In 1977, the minimum distance was increased to five feet and ten feet, respectively.
[3] A fascial angle is the twenty foot metal beam designed to be placed horizontally to connect the ends of roof purlins (see note 4, infra.) The beam is referred to as an "angle" because its 4" and 2" metal lips meet at a ninety degree angle. The smaller 2" lip is placed horizontally and screwed to the ends of the several roof purlins. The 4" lip or side hangs vertically along the outside of the building and is used for attachment of the vertical end wall sheets.
[4] Roof purlins are metal horizontal members running from the front to the back of the building and supporting the cross beam rafters.
[5] Measurements made at the scene of the accident contained in the report filed by McKnight and entered into evidence at trial show the burn marks on the plate where Hebert was standing were 15' 11¾ above the finished concrete flooring of the building. From these same burn marks in a straight line, it was 11' 4½" to the burn mark on the conductor (the energized aluminum wire). From the burn mark on the conductor to the ground measured 26' 4". There were three burn marks on the twenty foot fascial angle which had contacted the line, one each at distances of 1', 13' 23", and 14' from one end.
[6] Absolute liability is imposed in those situations where the risk is such that harm results from the very nature of the activity itself, irrespective of protective measures taken by the enterpriser. Some activities which involve so high a degree of risk as to be considered ultrahazardous are pile driving, storage of toxic gas, blasting with explosives and crop dusting with airplanes. Kent v. Gulf States Utilities Co., 418 So.2d 493 at 498 (La.1982). In deciding against the imposition of absolute liability upon a utility company, the majority stated in Kent, supra at 498-99.

On the other hand, the transmission of electricity over isolated high tension power lines is an everyday occurrence in every parish in this state and can be done without a high degree of risk of injury. And when the activity results in injury, it is almost always because of substandard conduct on the part of either the utility, the victim or a third party. (footnote omitted)
[7] Specifically, the Court found in Kent, supra at 499-500:

A combination of unusual factors concurred to cause this accident. The breaking down of the road machine caused the need to use the rake over an unusually long distance and period of time. The double width of the roadway caused the need to use an exceptionally long handle. The appropriation of the bench to another use caused the need to utilize the flip-flop method (which the Barber executives and others testified they had never seen used with such a long handle). The progress of the grooving to the point of intersection with the wires caused the need to devise an alternative method of procedure under the wires. Finally, Kent's act of raising the handle into wires he had just been warned to avoid was necessary to complete the unfortunate scenario.
[8] In essence the defendant argues that two men on two ladders could have raised the twenty foot piece of metal and secured it without involving the power lines. This does not take into consideration that the twenty foot piece of metal still had to be placed on the top outside end of the roof cross beams. Working from the inside of the building, it still would have been necessary in some way to thread the twenty foot piece of metal up between and over the cross beams which may have required still at some point swinging one end perilously close to the wires, while holding the other end. The other means suggested was to install it from the rear outside of the building. To do this, the workers would have had to work in the servitude itself, since the building was constructed flush with the property line. Under these circumstances, with the workers directly under the power lines, there existed potentially a greater danger of line involvement, even if it could be argued that they had the right or permission to go onto the servitude in the first place.