GUIDRY, Judge.
Giovanni Levi appeals the dismissal of his suit for damages against Southwest Louisiana Electric Membership Cooperative (hereafter Slemco) and its insurer, Federated Rural Electric Insurance Company (hereafter Federated), following an electrical accident. The jury, in response to written interrogatories, found Slemco’s conduct did not fall below the standard of care required of it. Levi’s motions for a new trial and judgment notwithstanding the verdict were denied despite the trial judge’s statement that he disagreed with the jury verdict.
Levi contends that: (1) the trial court erred in overruling his challenges for cause of prospective jurors who were members (customers) of Slemco, and who also expressed a belief that an adequate award of damages would increase their personal utility rates; (2) the trial court erred in refusing to instruct the jury that a power company may be held responsible for damages caused by things in its custody, including electrical distribution lines, if they are defective in design/manufacture and present an unreasonable risk of injury to others; (3) the jury verdict was erroneous in finding that Slemco did not fall below the standard of care to which it was subject; (4) the trial court erred in refusing to instruct the jury that if a power company knows of an activity in the area of its lines, it is under a duty to protect workers and others from foreseeable danger by making *901 further inquiry into the nature and extent of the activity and by continuing to provide insulation or covering for the wires; and, (5) the jury erred in failing to find Slemco at fault and not awarding damages.
FACTS
The facts of this case are basically undisputed. On February 16, 1982, Levi was working for Amoco Oil Company as a pumper in an oil production field referred to as Section 28, Dome Field, in St. Martin Parish. One of his duties was the operation of a paraffin truck which was used to cut paraffin or wax that accumulates in wells.
Amoco owns the Dome Field which consists of 22 producing wells which were drilled in the 1940s and 1950s. All the wells were drilled before Slemco constructed electrical distribution lines in the Dome Field.
Throughout the Dome Field a main shell road runs from one well site to another. In the 1960s Slemco constructed electrical distribution lines to serve most of the wells in the Dome Field and routed the lines either across the road from the wells or behind the wells, with the exception of the E.C. Stuart # 2 Well where the lines traversed the access road leading to the well within 41 feet of the well head. Electricity was not provided to the E.C. Stuart # 2 Well, but was provided to the wells on either side.
On February 16, 1982, the date of the accident, Levi was working at the Amoco St. Martin # 8 Well site with Randy Calais, a fellow employee, cutting paraffin. The truck Levi was operating was owned by Amoco and was outfitted with an A-frame and boom which rested over the front of the truck cab in a running position. When cutting paraffin from a well the worker would back into the access driveway and up to the well head, raise the boom and then lower the lubricator into the well. Levi’s truck was approximately 19 feet long and the boom was 26.5 feet long. The boom was manually operated by levers from the back left side of the truck bed. On the day of the accident, while coming out of the St. Martin # 8 Well, Levi and Calais encountered an equipment problem when a cable became entangled in the paraffin lubricator. Levi and Calais lacked the necessary tools to repair the lubricator and decided to lower the boom and drive to another part of the oil field in search of wrenches to disassemble the lubricator and untangle the cable. On the main road near the E.C. Stuart # 2 Well, Levi came across a group of contract employees doing gas line work for Amoco. Since Levi knew the workers, he stopped his truck and asked to borrow the wrenches he needed. The contract crew loaned Levi the appropriate tools, and he pulled his truck front end first onto the Stuart well road to a point close to the well head. Levi descended from his truck, went to the back left side, and started to raise the boom. Slemco power lines ran along the main road on the same side as the well and traversed the well access road approximately 40.5 feet from the well head. Levi remembers seeing the boom at a 45 degree angle, but shortly after that the boom either came very close to or actually touched the power line closest to the well. 14,400 volts of electricity were transferred from the electric line to the boom and metal A-frame, travelled into the handles of the levers Levi was operating, went through his cardiovascular system, and exited through his feet.
The electrical shock burn that Levi received caused devastating injuries: he suffered burns and scarring over approximately 25% of his body; the muscle and tissue damage to his lower extremities necessitated the amputation of both legs just below the knees. As of the time of trial, Levi had been hospitalized 10 times for 11 different surgical procedures.
JURY COMPOSITION
Levi contends that the trial court erred in overruling challenges for cause of jurors who were members of Slemco, and who expressed a belief that an adequate award of damages would result in an increase of their personal utility rates.
La.C.C.P. art. 1767 provides:
*902 “Although the entire jury may have been accepted and sworn, up to the beginning of the taking of evidence, a juror may be challenged for cause by either side or be excused by the court for cause or by consent of both sides, and the panel completed in the ordinary course.”
The record establishes that during voir dire Levi did not challenge for cause any juror who was a member of Slemco. It was not until the jury was accepted and sworn, and after a half day’s testimony that Levi objected to the Slemco jurors. Clearly, under La.C.C.P. art. 1767 Levi’s challenge came too late. Therefore, the trial court did not err when it refused to grant plaintiff’s untimely challenge.
JURY INSTRUCTIONS
Levi contends that the trial judge erred in failing to instruct the jury that the doctrine of strict liability applied to Slemco. He contends that the trial judge erred in not giving four jury instructions tendered by him on strict liability. He also argues that the trial court erred in failing to instruct the jury on Slemco’s legal duty once it became aware of the use of high masted equipment in the Dome Field. We disagree.
The jury instructions addressed various aspects of strict liability: instruction number 24 quoted the language of La.C.C. art. 2317; instruction number 25 explained the concept of having “a thing in your custody”; instruction number 26 shed light on what constitutes a defect; and, number 27 instructed that contributory negligence does not operate as a complete bar to recovery in products liability cases.
Levi first argues that, although the trial judge advised him that the requested jury instruction which recited La.C.C. art. 2317 (Instruction No. 24) would be included in the general charge, it was not. This circumstance, he urges, was only discovered after the appellate record was prepared.
We have carefully reviewed the record and find that the instruction was not given. Nonetheless, a party may not assign as error the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires. La.C.C. P. art. 1793. Levi’s objection which was first raised in brief to this court is, therefore, not timely and not properly before us.
Likewise, Levi’s other arguments relative to the remaining instructions were not properly preserved for appellate review. When a party objects to the failure to give an instruction, he shall state specifically the matter to which he objects and the grounds of his objection. La.C.C.P. art. 1793; Bechtel v. Entringer Bakeries, Inc., 422 So.2d 1299 (La.App. 5th Cir.1982). In the case sub judice counsel for Levi made only a blanket objection to the exclusion of the proposed charges, and did not specifically state the grounds for his objection. This does not comport with the requisites of La.C.C.P. art. 1793. In any event, the requested instructions were not appropriate under the circumstances and the trial court did not err in refusing to allow same.
LIABILITY OF SLEMCO
Appellant contends that the jury manifestly erred when it concluded that Slem-co’s conduct did not fall below the standard of care owed by it under the circumstances and thus was not at fault in causing his injuries.
The legal principles governing disposition of this issue are well settled.
It is too well settled to require citation of authority that, absent a demonstration of clear or manifest error, the trial court’s conclusions in factual matters should not be disturbed on appeal.
It is equally settled that, in electrocution cases, absolute liability is not imposed upon the utility company rather, although the utility company is held to a high degree of care, the principles of negligence apply and liability of the parties is determined under a duty-risk analysis. This principle was recently reaffirmed by our brethren of the First Circuit in Frazee v. Gulf States Utilities Co., 498 So.2d 47 (La.App.1986), writ *903 denied, 501 So.2d 215 (La.1987), wherein that court stated:
“The transmission of electricity over isolated high tension power lines is not considered to be an ultrahazardous activity, therefore absolute liability is not imposed on utility companies. In the case of an electrocution the principles of negligence apply and the liability of the various parties to the accident should be assessed under a duty-risk analysis. Hebert v. Gulf States Utilities Company, 426 So.2d 111 (La.1983); Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982). It is well settled that Louisiana courts require a high duty of care by those dealing in the manufacture and distribution of electricity. Utility companies which maintain and employ high voltage power lines are required to exercise the utmost care to reduce hazards to life as far as practicable, and are required to protect against reasonably foreseeable situations. Wooten v. Louisiana Power & Light Company, 477 So.2d 1142 (La.App. 1st Cir.1985).”
A duty-risk analysis involves a determination of whether the alleged tort-feasor’s conduct was a cause-in-fact of the victim’s harm; whether, under the circumstances, a legal duty was imposed upon the alleged tortfeasor; whether the tortfeasor breached that duty; and, whether the risk of harm which resulted in the damages was encompassed within the scope of protection imposed by that duty. Pierre v. Allstate Insurance Co., 257 La. 471, 242 So.2d 821 (1970). Further, while the causal relation issue involves an analysis of defendant’s conduct as a contributing factor in the injury, the duty issue is a policy inquiry into whether the defendant’s duty to the victim included protection against the particular injury. Sibley v. Gifford, Hill and Co., Inc., 475 So.2d 315 (La.1985).
An electric company has no legal duty to safeguard against occurrences that cannot be reasonably expected or contemplated. In other words, a utility company is not the insurer of the safety of persons moving about its power lines in the course of everyday living and is not held to anticipate every possible accident that might occur. Simon v. Southwest Louisiana Electric Membership Corp., 390 So.2d 1265 (La.1980).
Insulation by isolation of electric transmission lines is a recognized method of discharging the high duty of care owed by a utility company to reduce hazards to life, and is maintained until something intervenes which causes the isolation to deteriorate, i.e., a change in environment such as constructions etc., which may bring persons in closer proximity to the line thus exposing them to greater danger. Hebert, supra.
In support of his contention of jury error on the issue of Slemco’s liability, appellant urges that Slemco owed him a duty not to place its electrical lines so close to the E.C. Stuart # 2 well because it knew that high masted equipment serviced the wells in the Dome Field. In summarizing his position, appellant, in brief, states:
“The powerlines in question crossed the E.C. Stewart [sic] # 2 well road at a distance of 40.5 feet from the well head. The E.C. Steward [sic] # 2 well was located in the Dome Field along with approximately twenty-one other wells. There was only one other well site in the Dome Field where the powerline crossed the well road and these lines were isolated 150 feet from this well head. At one other well site the powerlines were located 87 feet from the well head, however the powerlines were routed across the main field road from the well road and these particular powerlines did not cross this particular well access road. The survey of the Dome Field clearly shows a zig-zag rerouting design near the various well sites. This zig-zag rerouting process clearly establishes a pattern and desire by SLEMCO to bypass the various well access roads. There can be no other conclusion but that SLEMCO recognized a risk of injury in maintaining powerlines above these well access roads.
[[Image here]]
The location of the power lines within 40.5 feet of the E.C. Stewart [sic] well would be far too close to the lines consid *904 ering the relative size of the paraffin lubricator, workover rigs and other high masted equipment used in the oil field. The most important factor which is similar to Hebert, supra, is the knowledge that SLEMCO had of the operations in the Dome Field. This knowledge is evidenced by testimony of SLEMCO employees that they were aware of the use of high masted equipment including paraffin lubricators in the Field. This knowledge of the risk of harm is further evidenced by the conscious effort of SLEMCO to avoid the various well access roads through a design process of bypassing these various wells. SLEMCO used this bypass process for all well sites except for the accident site and in one location where the powerline was located 150 feet from the well head.”
Slemco’s argument in support of the jury verdict is five-fold: (1) it complied with the safety standards and isolated the wires at least 20 feet above the ground; (2) Levi was not servicing the E.C. Stuart # 2 Well at the time of the accident; (3) Slemco did not provide electrical service to the well; (4) although Slemco may have been aware of the presence of high masted equipment in the Dome Field, it had no knowledge that the equipment was operated near its electric lines; and, (5) Levi raised the boom of his paraffin truck into a clearly visible power line.
Cause-in-fact is not in question in the case sub judice as Slemco's energized line was the cause of plaintiff’s electrocution. The principal issue in this case is whether, under the circumstances, Slemco breached a duty of care owed to plaintiff and, if so, whether the risk of harm which resulted in plaintiff’s damages was encompassed within the duty breached. Presumably, the jury found no breach of duty on the part of Slemco and/or that the risk of harm which resulted in plaintiff’s damages was not encompassed within Slemco’s duty.
We have carefully considered the record in this case in light of the settled principles set forth above and discern no clear error in the jury’s determination that, under the circumstances present, Slemco was not at fault in causing plaintiff’s injuries.
The record reflects the following. The construction of Slemco’s lines in the Dome Field is in compliance with safety standards established by the National Electric Safety Code. All of the wells located in the Dome Field were drilled and in production before Slemco constructed its lines. There has been no environmental change in the Dome Field since Slemco’s lines were installed some 16 years prior to this accident. Slemco was aware that high masted paraffin trucks, such as that operated by plaintiff, serviced wells in the Dome Field. The Slemco line crosses the E.C. Stuart # 2 well road at a distance of 40.5 feet from the well head. The location of this line poses no danger to high masted equipment servicing this well, such as that operated by appellant, i.e., a truck 19 feet long with a boom 26.5 feet long, because in servicing such well, it was necessary to back down the access road to the well and then raise and position the service equipment over the well head. At the time of the accident appellant was not servicing the E.C. Stuart # 2 well.
In our view, the facts above set forth when considered together with the circumstances surrounding the unfortunate accident do not support a conclusion that Slem-co violated any legal duty owed to appellant.
Levi was not in the process of servicing the E.C. Stuart # 2 well. Therefore, the fact that such line crosses the Stuart well road in close proximity to the well head is significant only insofar as it concerns the scope of the duty owed by Slemco to the public in general and in particular to persons working in the Dome Field.
The Stuart well road is a dead end road which intersects the main road through the Dome Field and was constructed solely for the purpose of gaining access to the Stuart well. Slemco could reasonably expect that this road would be used almost exclusively by persons servicing the Stuart well. Although Slemco was aware that high masted equipment was used in the Dome Field, it had no knowledge that such equipment *905 would be operated near its electric lines. In fact, Slemco’s routing design for its lines in the Dome Field, including the line traversing the Stuart well road, was such that its lines posed no danger to high masted equipment serving any of the 22 wells in the field. Although Slemco may be reasonably held to know that the high masted equipment used in the Dome Field will, from time to time, require repair, it could not reasonably be expected to foresee or contemplate that such repairs would be conducted such that the boom or mast would be raised into a clearly visible power line.
Like the accident in Kent, supra, a combination of unusual factors concurred to cause this accident. The entanglement of the cable in the paraffin lubricator while performing work on the St. Martin # 8 well; the lack of tools necessary to disassemble the lubricator at the site of the break-down; the discovery of a crew on the main road across from the Stuart well road with the necessary tools to effect the repairs; the decision of appellant to pull his truck front end first onto the Stuart road in close proximity to the Slemco line although several other nearby safe locations were available; and, finally, Levi’s act of raising the boom into a clearly visible power line of which he was admittedly aware. In sum, the accident in this case, like those considered in Simon, supra, and Kent, supra, could not reasonably have been anticipated and therefore, the risk of harm suffered is not within the scope of the duty owed by appellee to appellant. As stated in Hebert, supra, there is “no ease of association between the risk presented by the utilities conduct under the overall circumstances and the resulting injuries”.
For these reasons, the judgment of the trial court will be affirmed at appellant’s cost.
AFFIRMED.
KNOLL, J., dissents and assigns written reasons.