538 So.2d 291 (1989)
Alfred Lee WRIGHT, Jr.
v.
U.S. GYPSUM COMPANY, et al.
No. CA 9286.
Court of Appeal of Louisiana, Fourth Circuit.
January 17, 1989.
Rehearing Denied February 16, 1989.
*292 George T. Mustakas, II, Metairie, for plaintiff.
Charlton B. Ogden, II, Charlton B. Ogden, III, Ogden & Ogden, New Orleans, for defendant.
George J. Nalley, Jr., Carmouche, Gray & Hoffman, New Orleans, for intervenor.
Before SCHOTT, C.J., and KLEES and PLOTKIN, JJ.
PLOTKIN, Judge.
This is a pre-comparative negligence case requiring an analysis of the defendant's negligence and plaintiff's contributory negligence.
Plaintiff, Alfred Lee Wright, Jr. (Wright), a painter-sandblaster and the operator in control of an ascending metal cage, came into contact with an elevated electrical distribution line owned, installed and maintained by the defendant New Orleans Public Service, Inc. (NOPSI). The metal cable holding the cage severed causing the plaintiff to fall 35 to 40 feet to the ground and injure himself.
The jury rendered a verdict for Wright in the sum of $437,899, including the sum of $62,313 for worker's compensation benefits paid by intervenor, Fidelity & Casualty Ins. Co., the worker's compensation insurer of M & I Coating, Wright's employer. NOPSI appealed, asserting five assignments of error: (1) that the jury erred in finding NOPSI negligent; (2) that the jury erred in finding Wright free from any negligence; (3) that the trial judge erroneously instructed the jury as to the applicable law; (4) that the trial judge erred in failing to grant the defendant's JNOV; and (5) that the jury erred in awarding damages. Wright cross-appealed seeking an increase in damages.
FACTS
In 1955 NOPSI constructed, on standard 50' poles, three uninsulated electrical distribution lines carrying 13,800 volts. The lines were attached to cross bars at various heights ranging from 35 to 43 feet from the ground. The electrical line involved in this case was 35 feet above the ground. The lines were constructed and maintained in conformity with the requirements of the National Electric Safety Code (NESC). The lines were routinely inspected every eight years. Prior to this accident, no injuries or problems had occurred.
Subsequently, the U.S. Gypsum Plant was constructed. The plant included a conveyor belt mounted on a steel structure. Bulk ore was moved along the belt from the industrial canal over the electrical lines and into the plant processing equipment. NOPSI temporarily rerouted the electrical lines during the construction of the conveyor *293 belt. The belt is considered a bridge for the purposes of applying clearance under the NESC. The NESC mandates a five-foot vertical and horizontal clearance from the conveyor belt (bridge) for 13.8 kv distribution lines. It is undisputed that the nearest vertical distance from the conveyor belt structure to the lines was 24 feet 1 inch and the horizontal distance was 15 feet 7 inches, a distance substantially in excess of the required five-foot minimum set by the NESC.
Wright, who was 46 years old at the time of trial, was an experienced professional sandblaster-painter, having worked in that trade for more than 20 years. He possessed a ninth-grade education and served in the military.
Prior to the accident, Wright worked at the U.S. Gypsum plant for three weeks as part of a three-man crew employed by M & I Coating Specialists, Inc., which provided all the equipment. Wright's function was to sandblast and paint the conveyor belt. In the absence of a superior, he was in charge of the working crew. Two men assisted him. Mike Wallace rigged the equipment each time it was moved to a new location on the structure. August Ducet mixed the paint and kept the paint lines untangled.
In order to paint the highrise structure, it was necessary for Wright to work in a metal cage called a "spider sky climber." This cage is approximately 3½ feet wide by 5 feet high. The sky climber was attached to the conveyor belt structure by a metal cable. The cable was fed through a pneumatic motor which raised or lowered the cage and was operated by the occupant. There are four lines to the ground from the spiderthe metal cable, a rope used to lift equipment from the ground and stabilize the cage, an air hose and a paint hose.
Wright had only a 4 feet horizontal reach from each side of the spider. Therefore, he had to lower the cage frequently to permit Wallace to rig it into a new position. The initial rig marks were at Wright's instruction. Subsequently, because of previous coats of paint, the marks became apparent and there was no further need to direct Wallace where to rig the spider. Wright's procedure was to raise the spider above the electric lines, then paint from the spider or to attach a ladder to the conveyor belt structure, climb out of the spider and work from the ladder. Wright was familiar with the equipment and procedure.
Wright worked continuously for three weeks around the electric lines. They were clearly visible and he knew that they were a danger to him. Wright's knowledge and awareness of electricity and its inherent danger at the time of the accident is clear. He testified as follows:
Q. Mr. Wright, before this accident had you worked around electricity before?
A. Yes, I'd been working.
Q. And you knew electricity was dangerous?
A. I guess everybody does.
Q. And you knew these electric lines were dangerous?
A. I took it for granted, yes.
Q. And you knew they could kill you, did you not?
A. Yes, I assumed.
On December 19, 1979, after lunch, Wright and the crew were applying the last coat of paint to the underside of the structure. The cage was rigged to the premarked unpainted site which had been used four previous times without incident. From that site the metal cable hung from the top of the metal structure to the ground only 2½ feet horizontally from the electric line. Wright testified that he placed the basket close to the cable "because I wanted to get as much of the structure [as] I could, the steel from the top."
Wright ascended in the cage with his left hand on the controls. He testified as to his conduct as he neared the electric lines:
"Well, I was coming up in my basket and I reached for my spray gun and all I seen was a blue flash and I was down. I really don't know what happened, it happened so fast." (Emphasis ours)
I note that in his deposition taken in November 1981, Wright described the weather as a "windy nice day" and stated that the *294 basket "was swaying a little bit." He testified:
Q. What exactly was it that hit the power line? What part of your equipment?
A. My basket.
Q. What made you fall?
A. The electric wire. When I hit the electric power line, it jumped....
The cage either contacted the power line or came within ¼ to ½ inch of it. When current flowed from the line to the spider and up the cable to the grounded metal structure, it caused the cable to burn and sever. The plaintiff fell 35 to 40 feet to the ground. He sustained fractures of the heels of both feet and injury to his right knee. He underwent two surgeries and has a 25 percent permanent physical impairment of the left foot, 15 percent permanent physical impairment of the right foot and a 10 percent impairment of the right knee.
Wright contends that the cage did not come into contact with the electric lines but that an electrical arc jumped from the line to the cage. He further argues that he knew nothing of the arcing properties of electricity, even though he acknowledges that he knew the lines were dangerous. Therefore, he claims that the lines should have been insulated which would have prevented arcing. Alternatively, he claims warnings should have been posted or the lines buried underground.
All of the experts agree that if an arc occurred, the distance between the cage and the line could have been only ¼ to ½ inch under ideal conditions.
NOPSI argues that it was not negligent, and that the evidence unquestionably indicates that as a result of the plaintiff's negligence the basket contacted the electric line. The spider cage is 3½ feet × 5 feet square, with the cable attached directly through the center of the unstable basket. Thus, the cable hung approximately 2½ inches from the hot wire and, because the cage was 3½ feet wide, the cage contacted the hot line.
I conclude the basket probably contacted the electrical line directly as plaintiff's expert opined and as the plaintiff's testimony suggests, but under a factual finding of arcing or contact, the legal result would be the same.

JURY INSTRUCTIONS
NOPSI contends that the trial judge failed to charge the jury correctly and lists seven timely-requested jury charges which the court declined to utilize. The primary error was the court's refusal to charge the jury concerning duty-risk rather than proximate cause.
In 1962, the Louisiana Supreme Court disapproved the use of proximate cause jury instructions in cases were the defendant's liability resulted from violation of a statute. Dixie Drive It Yourself System v. American Beverage Co., 137 So.2d 298 (La.1962). Instead of asking whether the wrongful conduct was a proximate cause of the harm, the judge should ask "whether the risk and harm encountered by the plaintiff fell within the scope of protection of the statute." Id. at 304.
In 1972, the Supreme Court held that the Dixie, supra, approach was equally applicable in non-statutory duty cases. In Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972) the court stated as follows:
Where the rule of law upon which a plaintiff relies for imposing a duty is based upon a statute, the court attempts to interpret legislative intent as to the risk contemplated by the legal duty, which is often a resort to the court's own judgment of the scope of protection intended by the legislature. Where the rule of law is jurisprudential and the court is without the aid of legislative intent, the process of determining the risk encompassed within the rule of law is nevertheless similar. The same policy considerations which would motivate a legilative body to impose duties to protect from certain risks are applied by the court in making its determination.
Id. 256 So.2d at 622-23.
The court further clarified the duty-risk doctrine in Shelton v. Aetna Cas. & Sur. *295 Co., 334 So.2d 406 (La.1976), to a landowner's conduct, by stating as follows:
(f)inding that defendant landowner's conduct was the cause in fact of plaintiff's injury does not establish liability, but the court must ascertain whether landowner breached legal duty imposed to protect against particular risk involved; and in making this determination, inquiries must be made as to what, if any, duty was owed by landowner to plaintiff, whether there was breach of duty, and whether risk, and harm caused, was in scope of protection afforded by duty breached. (Emphasis added)
A review of subsequent jurisprudence in electrocution cases reveals that the Supreme Court consistently utilized and mandated a duty-risk analysis. Hebert v. Gulf States Utilities Co., 426 So.2d 111 (La. 1983); Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982).
In a typical negligence case, such as the one before you today, against the owner of a thing which is actively involved in the causation of injury, the claimant must prove that something about the thing created an unreasonable risk of injury that resulted in the damage, that the owner knew or should have known of that risk, and that the owner nevertheless failed to render the thing safe or to take adequate steps to prevent the damage caused by the thing. Under traditional negligence concepts, the knowledge (actual or constructive) gives rise to the duty to take reasonable steps to protect against injurious consequences resulting from the risk, and no responsibility is placed on the owner who acted reasonably but nevertheless failed to discover that the thing presented an unreasonable risk of harm.
Kent v. Gulf States Utilities, 418 So.2d 493 (La.1982).
The court refused to give NOPSI's charge saying:
I'm not going to use the duty risk per se that the appellate court used in discussing legal duties and obligations. I'm using something akin to it, but not exactly duty risk. So, I'm using a proximate cause thing, cause and (sic) fact, substantial fact.
The court's classic instruction of proximate cause in this case was confusing and misleading to the jury. Furthermore, it omitted an explanation of the duty-risk analysis which is required in a negligence/electrocution case. This omission prejudiced NOPSI before the jury because the jury was not afforded an opportunity to consider whether the duty owed by the defendant encompassed the risk of harm to which the plaintiff was exposed. It is therefore unnecessary to consider the remaining allegations of jury instruction error.
Following the guidelines of Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975), I would reverse the jury verdict because of the erroneous jury instruction and, because the record is complete, institute a de nova independent review of the record of both fact and law. La. Const.1974, Art. 5, Sec. 10(B); Thomas v. Missouri Pacific Railroad Co., 466 So.2d 1280 (La.1985).

NOPSI'S NEGLIGENCE
A duty-risk analysis involves a determination of whether NOPSI's conduct was a cause-in-fact of Wright's harm, whether a duty was imposed upon NOPSI to protect Wright under the circumstances, whether NOPSI breached that duty, and whether the risk which resulted in injuries was encompassed within the scope of protection imposed by that duty. Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821 (1970); Levi v. Southwest La. Electric Membership Co-Op., 524 So.2d 899 (La. App. 3d Cir.1988). Cause-in-fact is not an issue here because NOPSI's electric lines were a cause of plaintiff's injury.
The legal precepts governing electrocution are well-settled. The general principles were most recently elucidated in Levi, supra:
The transmission of electricity over isolated high tension power lines is not considered to be an ultrahazardous activity, therefore absolute liability is not imposed on utility companies. In the case of an *296 electrocution the principles of negligence apply and the liability of the various parties to the accident should be assessed under a duty-risk analysis. Hebert v. Gulf States Utilities Company, 426 So. 2d 111 (La.1983); Kent v. Gulf States Utilities Company, 418 So.2d 493 (La. 1982). It is well settled that Louisiana courts require a high duty of care by those dealing in the manufacture and distribution of electricity. Utility companies which maintain and employ high voltage power lines are required to exercise the utmost care to reduce hazards to life as far as practicable, and are required to protect against reasonably foreseeable situations. Wooten v. Louisiana Power & Light Company, 477 So. 2d 1142 (La.App. 1st Cir.1985).
NOPSI's electric lines were in compliance with and in excess of the standards decreed by the NESC. NOPSI had no knowledge of the work being performed. Their equipment was not defective or improperly maintained. NOPSI concedes in brief and argument that it was reasonably foreseeable that workers would maintain the conveyor belt structure, but alleges that the power line was not an unreasonable risk of foreseeable harm to these workers.
Plaintiff Wright argues that compliance with the NESC is insufficient and that good engineering, safe practice and common sense impose upon NOPSI the burden to anticipate the presence of workmen near the hot wires and protect them from danger. This duty requires a written warning, line insulation and/or line relocation.
I have carefully searched this record for circumstances which indicate NOPSI breached a duty of care to the plaintiff and if so, whether the risk of harm which resulted in Wright's damages was encompassed within the duty breached. I find no breach of duty of care owed to Wright.
The electric lines were clearly visible. They were 24 feet 1 inch below, 15 feet 7 inches horizontally from the nearest support structure and from 35 to 43 feet above ground. The lines were insulated by reasonable isolation. There is sufficient clearance in all directions so that a reasonable workman performing foreseeable painting and maintenance could safely perform his duties. Therefore, the lack of a strip of insulation covering these wires as they crossed beneath the conveyor belt was not a breach of duty owed by NOPSI, which could reasonably expect that adequate clearance between the lines and the belt existed. Furthermore, it is unforeseeable that a painter would operate his equipment in such a manner that it came either into direct contact or within less than ½ inch of the line.
The fact that NOPSI did not post written warnings in the area did not breach a duty owed to Wright because the warning would not have eliminated the risk of harm. Wright, at all times, knew that the lines were lethal and dangerous if contacted. His knowledge of the risk of harm based on his experience as a painteras well as his being a person of average reasonable intelligenceeliminates the duty to post warning signs.
Wright further argues that the lines should have been buried underground to avoid the foreseeable harm. Failure to pursue this optional course of conduct is not a breach of the duty of care the defendant owed to the plaintiff. NOPSI's choice to distribute electrical power through elevated lines, in a non-negligent manner, is authorized by custom and law. Although hot lines may be safer underground for those workers above ground, this question is one of corporate decision-making and policy, which balances the economic risk of loss against gain. I do not find a breach of duty by the defendant for failing to route these lines underground.
Wright strenuously contends that NOPSI's liability standard for injuries caused by "arcing" is different from those caused by direct contact. He argues that the electrical phenomena of "arcing" is a hidden danger to foreseeable workers near power lines and that a greater duty of care is owed to the worker. He incorrectly cites the following cases for this principle.
In Boure v. NOPSI, 255 So.2d 776 (La. App. 4th Cir.1972), a spray painter came in contact with defendant's high tension wire.
*297 The court held that NOPSI was liable because it had notice that work was being performed over the lines and it failed to take preventive action to de-energize the line.
In Hebert v. Gulf States Utilities Co., 426 So.2d 111 (La.1983), a worker constructing a metal building was electrocuted when a piece of metal he was installing contacted a power line. Four days prior to the accident a crane struck the line and service was temporarily halted. The court found that the utility had notice of a dangerous condition and breached its duty by failing to take protective measures to de-energize the line.
Finally, in Price v. Mitchell Construction Co., 482 So.2d 869 (La.App. 2d Cir. 1986), a worker carrying sheets of roofing steel contacted a power line 3 feet 3 inches from the top of the structure. The court held the energy supplier liable because it had knowledge of the building construction and because of the close proximity of the lines to the building. The supplier, therefore, either knew or should have known of the danger and should have foreseen the likelihood of the occurrence of the accident and taken preventive steps either to de-energize the lines or to install temporary rubber insulation.
The three cases cited above are distinguishable from the case at bar because in each the electrical supplier knew that work or prior accidents had occurred near or upon the power lines. In this case, NOPSI had no specific knowledge of the painting work nor of any prior accident; it had no notice of the need to undertake preventive measures other than the isolation then in effect. The legal principle in all three cases above is similar in that the power supplier owes a duty of utmost care to reduce the hazards as far as practical.
This court recently had the opportunity to consider a case involving very similar issues to those presented in the instant case. In Washington v. Louisiana Power and Light, 532 So.2d 798 (La.App. 4th Cir. 1988), the court held that the electric power company had fulfilled its duty to a CB enthusiast which it could have anticipated would come in contact with a high voltage power line. The court held that the power company's duty was met either by insulating the line, by giving adequate warnings of danger or by taking any other reasonable and proper precautions to prevent injuries. Id. at 801. In the instant case, NOPSI met the duty by insulating the line by isolation.
I conclude that the utility's duty is to exercise the utmost care to reduce hazards to life as far as practical. This standard applies to arcing and contact cases. I find that NOPSI did not act unreasonably in failing to protect Wright from the risk of harm by electrocution. NOPSI's decision not to insulate these lines beyond insulation by isolation, was not unreasonable in the absence of specific knowledge of the risk of harm attending the work on the conveyor belt. I find that NOPSI complied with the NESC and did not breach its duty of utmost care owed to the plaintiff and that there is no ease of association between the risk presented by NOPSI's conduct and the injury which occurred. Kent, supra.

WRIGHT'S CONTRIBUTORY NEGLIGENCE
The parties have expended substantial resources on the issue of Wright's contributory negligence, that is, whether his conduct precludes his recovery. I am compelled to comment on this issue in this case.
The Supreme Court determined the criteria for electrical injury in Hebert, supra, stating:
working near electrical power lines is neither contributory negligence per se nor assumption of the risk. Likewise the fact that a person's own actions bring him in contact with high voltage wires does not necessarily make him negligent. The question, as enunciated in Dyson v. Gulf Modular Corporation, 338 So.2d 1385 at 1390 (La.1976) is whether "the party's conduct conform[ed] to the standard of care that would be exercised by a reasonable man; or did the conduct breach a duty imposed upon the party to protect against the particular risk from which the accident resulted?" In other *298 words, did the plaintiff Hebert breach a duty to himself by failing to avoid the unreasonable risk created by the defendant utility company?
Although Wright had worked around the power lines for three weeks, and the rigging mark had been used previously without incident, he was the sole cause of the accident. He testified twice that as he operated the ascending cage in the wind, his left hand was on the controls and, as he approached the wire, he negligently and carelessly turned his attention to picking up his spray gun. At that moment, the cage contacted the wire or an arc occurred when the cage came within ¼ to ½ inch of the wire and the cable was severed. His inattention to a known danger is conduct below that of the average reasonable commercial painter. His injury was not caused by an unreasonable risk of harm created by NOPSI but by his own substandard conduct, making him contributorily negligent.

CONCLUSION
For the reasons stated, the judgment of the trial court is reversed and judgment is rendered for the defendant NOPSI dismissing the plaintiff's and intervenor's lawsuits. Each party is to bear his own costs.
REVERSED AND RENDERED.
SCHOTT, C.J., and KLEES, J., concur with written reasons.
SCHOTT, Chief Judge, and KLEES, Judge, concurring:
The trial judge should have instructed the jury on duty-risk. But his instructions were adequate to enable the jury to decide the case in accordance with applicable law. Following a discussion about proximate cause and contributory negligence the instructions continued with the following:
With respect to this accident, you should also consider the following rules of law in determining whether or not the defendant is negligent and whether or not the plaintiff is guilty of contributory negligence. One such rule is the operator of high voltage electric lines is required to use the utmost care to reduce hazards to life as far as practicable. In places where it should be reasonably anticipated that persons may contact electric lines, the operator of those lines is required to insulate them or to give adequate warning of the danger or to take other and reasonable precautions to prevent injury. The operator of a high voltage line, however, is not required to guard against hazards which cannot be reasonably anticipated.
This part of the instruction embodies the law outlined in Hebert v. Gulf States Utilities Co., 426 So.2d 111 (La.1983) and Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982). But the two cases produced opposite results based on conflicting facts. In Kent the court said the "bottom line" for determining liability was to determine whether the utility took reasonable steps to protect against the risk that a person on the ground would come in contact with the electric lines. The court concluded that the utility did not act unreasonably by failing to take additional precautions "(such as installing rubber hose in the area of construction)" beyond insulation by isolation.
On the other hand the court in Hebert found that the risk of electrocution of an iron worker on the roof of a building under construction was within the scope the utility's duty to exercise the utmost care to reduce hazards to life as far as practicable where the power line was about four feet above and three feet away from the head of the worker. In its discussion of the facts of the case the court noted that the accident took place in an industrial park where construction of metal buildings was commonplace; and a similar accident had occurred shortly prior to Hebert's. In comparing the case to Kent the court noted: "Moreover, the risk is different to one assigned to work fifteen feet above the ground and atop a structure which is within ten or eleven feet of the power line, than for ground level workers who must use extraordinary means to contact the overhead electrical lines."
In the present case Wright voluntarily chose to position the cage, while suspended from a cable 35'-40' above the ground, *299 about nine inches from this power line in order to paint as much of the conveyor as possible from the cage. This risk, created by Wright's foolhardy or even reckless conduct of getting so close to the line that the slightest sway would bring the cage in contact with the line, was not within the scope of NOPSI's duty. By isolation of its lines it took reasonable steps to protect against the risk of electrocution to those who would act reasonably in painting or otherwise maintaining the conveyor.
We attach no significance to plaintiff's "arc" theory. The evidence shows that the longest the arc could have been was ½ inch. This is so notwithstanding Dr. Bergeron's testimony that it could have been longer because of pollutants in the atmosphere. Although asked how much longer it could have been he never stated an amount. Whether plaintiff placed his cage in contact with the line or within ½ inch is a distinction without a difference. The risk he created was not within the scope of defendant's duty of care with respect to the line.
The jury was properly instructed in accordance with Kent and Hebert that defendant was not required to guard against hazards which cannot be reasonably anticipated. The jury committed manifest error in failing to find that plaintiff's conduct was such a hazard.