477 So.2d 1142 (1985)
Georgia H. WOOTEN
v.
LOUISIANA POWER & LIGHT COMPANY, et al.
No. 84 CA 0571.
Court of Appeal of Louisiana, First Circuit.
October 8, 1985.
Rehearing Denied November 8, 1985.
*1143 Stanwood R. Duval, Jr., Duval, Funderburk, Sundbery & Lovell, Houma, for plaintiff and appellee.
Philip J. McMahon, McMahon, McCollam & Hargis, Houma, for defendant and appellant-Gulf Oil Co.
George F. Riess, Monroe & Lemann, New Orleans, for defendant-Louisiana Power & Light Co.
Christopher H. Riviere, Porteous, Hainkel, Johnson & Sarpy, Thibodaux, for defendant-Jules Hebert Sr.
Nan M. Landry, Landry, Watkins & Bonin, New Iberia, for defendants-Emelda L. LaRussa, Phillis LaRussa and Annie L. LaRussa Chauvin.
Before COVINGTON, C.J., and WATKINS and SHORTESS, JJ.
SHORTESS, Judge.
An accident resulting in the electrocution of James W. Wooten (Wooten) occurred on April 6, 1982, as he was assisting in removal of an outdoor sign beneath a live electrical wire at a Tunnel Boulevard service station in Houma, Louisiana. Wooten's widow, Georgia H. Wooten (plaintiff), filed a suit for wrongful death, individually and as natural tutrix of her minor child, Sonya Michelle. Defendants were Louisiana Power *1144 & Light Company (LP & L), owner of the electrical line; Gulf Oil Corporation (Gulf), lessor of the service station and owner of the sign since 1963; Jules A. Hebert, Sr. (Hebert), Gulf's assignee from 1978 to 1982; and Professional Auto Care, Inc. (PAC), Hebert's assignee at the time of the accident.
The trial court upheld motions for summary judgment, dismissing with prejudice Hebert and PAC. A consent judgment in favor of plaintiff and against LP & L for $215,000.00 resulted in the dismissal of LP & L, as well as Gulf's third party demand against LP & L. The case was tried against Gulf, the sole remaining defendant.
The jury returned a general verdict in favor of the defendant after answering the first written interrogatory, finding that Gulf was not negligent. Plaintiff filed a motion for a judgment notwithstanding the verdict (JNOV) and, alternatively, for a new trial. The trial court held that the jury misapplied the law, that Gulf's negligence was the proximate cause of Wooten's death, and that Wooten was neither contributorily negligent nor assumed the risk. Deciding those issues not reached by the jury, the court awarded damages of $279,718.72 to plaintiff and $126,391.33 to her child. LP & L was also found to be negligent, with that negligence a proximate cause of Wooten's death. Thus LP & L and Gulf, as joint tort-feasors, were responsible to the extent of 50% each. Since LP & L settled with plaintiff, the court reduced plaintiff's award by 50%.
The issues on appeal are:
(1) whether the trial court used the correct legal standard in applying the JNOV; and
(2) whether the trial court committed manifest error in the use of the JNOV to determine:
a. that the negligence of both Gulf and LP & L was the cause-in-fact of Wooten's death;
b. that there was neither contributory negligence nor assumption of the risk by Wooten; and
(3) whether the amount of damages awarded after the JNOV by the trial court to plaintiff was adequate.

JNOV
LSA-C.C.P. art. 1811 clearly gives the trial court authority to grant a JNOV to consider both issues of liability and damages. Its amendments have been held to be procedural in nature and applied retroactively. Robertson v. Penn, 472 So.2d 927 (La.App. 1st Cir.1985); Price v. Louisiana Farm Bureau Mutual Insurance Company, 457 So.2d 722 (La.App. 2nd Cir. 1984), writs denied, 462 So.2d 205, 206 (La.1985). We have applied the U.S. Fifth Circuit standards:
On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence  not just that evidence which supports the non-mover's case  but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.
Boeing v. Shipman, 411 F.2d 365, 374 (5th Cir.1969).
We have held that a JNOV should be granted only when the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. In applying this standard the court cannot weigh the evidence, pass on the credibility of witnesses, or substitute its judgment of facts for that of the jury. However, where virtually no factual dispute exists, thus requiring no credibility determinations, legal questions *1145 concerning duty-risk, assumption of the risk and contributory negligence are within the province of the court. The inquiry in the JNOV hearing focuses on whether the facts constitute negligence on the part of plaintiff or defendant. Rougeau v. Commercial Union Insurance Company, 432 So.2d 1162, 1166 (La.App. 3rd Cir.1983), writ denied, 437 So.2d 1149 (La.1983). We must review the record to determine whether the judge's legal conclusions based on the facts were manifestly erroneous.

LIABILITY
The parties stipulated that LP & L installed the 8,700-volt electrical line along Tunnel Boulevard in 1962; that Gulf installed its sign in 1964; that the topographic survey of the service station and sign location by surveyor Kenneth L. Rembert was accurate; and that the measurements of the line and sign were as follows: the sign was six feet across; its pole was 16 feet tall, with inclusion of the concrete base making the top of the Gulf sign 22 feet 8 inches above the ground; the power line was 26 feet 9 inches from the ground, but its horizontal clearance above the sign was zero, with a vertical clearance of 49 inches; and the line was approximately above the middle of the sign  three feet six inches from its edge. The parties partially stipulated to the accuracy of the Harold Olsen drawing of the sign and position of the victim at impact and afterward based on photographic and medical evidence of burns.
PAC, the latest assignee of the service station lease, intended to switch the sale of gasoline brands from Gulf to Shell and requested that the Gulf-Shell jobber change its sign to reflect that fact. When the jobber failed to perform as requested, See-More Outdoor Advertising (See-More) was given the job. Royal Musso, general manager of See-More, estimated that the normal four-hour job would require about two days due to the hazards created by the proximity of the sign to the wire.
Musso testified that he had not actually measured the distance from the sign to the wire, that looking up against the background of the sky made estimation of distance difficult, that he had never worked on a sign so close to and underneath a wire before; and that if he had had any doubts prior to the precautionary estimates taken, he would have gone about the job differently. Houma policeman Wayne Ledet and Gulf witness Harold Paul LeRay corroborated the difficulty of estimating distances between the sign and wire when looking up from the ground.
A boom truck with a 60-foot extension ladder was utilized, with Wooten stationed on the boom and Musso operating the boom controls from inside the truck. Wooten, extended over the front of the boom and reaching over the center of the sign, attempted to attach a chain hook to an eyebolt on the top of the sign when the accident occurred. Musso testified that it was necessary to put the boom's ladder over the top of the sign because earlier attempts to reach the eyebolt from the side proved fruitless. Musso, who minutes before had been watching Wooten, glanced away toward the highway, then heard a crackling noise, a muffled explosion, and a scream and looked up to see Wooten in flames. Wooten "had just begun to fall over the front of the ladder, basically from the waist over."
No one had called LP & L to request either a cut off of electricity or a rubber blanket over the line. Wooten was not wearing a safety hat or gloves.
Officer Ledet arrived to investigate the accident approximately two minutes after it occurred, in time to see the smoking victim being taken off the ladder. He described Wooten as badly burned, with two burns above his knees, and on his head, feet, hands and arms. Ledet found the missing top part of Wooten's scalp still connected to the wire and police photographs depict a black spot on the sign which shorted out where the ladder made contact with it and a burnt spot on the power line, where the top of Wooten's head hit.
*1146 Plaintiff's expert Harold Olsen, an electrical engineer, reconstructed the accident based on police photographs, medical evidence and testimony. It was Olsen's opinion that Wooten found the hook too thick to go through the eyebolt and was in the process of coming down when he lifted up and his head came into contact with the conductor. He determined that the back of Wooten's shoes, his legs above his knees and his hands were burnt because he was sitting on the ladder with his legs through it, his heels touching the rung of the ladder, his knees touching the plastic front of the sign and his hands on top of the ladder.
At the trial, Billy Stubbs, area Gulf maintenance superintendent, testified that Gulf replaced the original sign erected in 1964 with a new six-foot sign in 1968; that Gulf had no written policy on sign locations at its service stations; that it was his personal policy to move a sign location back ten feet from overhead power lines, to provide for possible future change to a rotating sign; and that although Gulf had maintained the sign prior to a 1981 agreement with its jobber, it was unaware that the sign was being moved.
Gulf's witnesses testified that the applicable 1961 National Electrical Safety Code (Code) specified no clearances over signs; that Gulf had followed good or accepted engineering practices in installing the sign because it did not violate the then applicable Code; and that normal maintenance should not require any dangerous contact with the wire. Existing installations were exempt from later more stringent Codal clearance requirements unless violation of the newer Codes posed a danger. However, the Code embodied minimal safety requirements to protect employees and the public, and all Codes (from 1961 to the present) required a continuing duty of inspection. John Martin, Gulf District Operations manager, and electrical engineering experts LeRay and Gregory Lindsly admitted either that it would have been safer to treat signs as buildings under the 1961 Code with a three-foot horizontal and eight foot vertical clearance; that, in the absence of a Code provision, they probably would not have placed the sign right under the wire; or that if safety reasons were involved, a sign should be brought into compliance with later protective restrictions in the Code.
Gulf witnesses Lindsly and LeRay identified factors considered as good engineering practices: (1) who or what might be interposed between the sign and the power line; (2) what kind of maintenance might take place in the sign's vicinity; (3) any mitigating or unusual circumstances; (4) anticipation of future growth; (5) uniform heights of pole increments (five feet); and (6) anticipation of all personnel and hired construction companies which would perform work on the sign.
LeRay testified that the accident could have been prevented by (1) "not going up the ladder" to remove the sign, (2) de-energizing the line, (3) insulating the line, or (4) wearing a hard hat to enable the workman to withstand 8,000 volts.
Lindsly testified that the wire was insulated by isolation, that is, not by a covering but by the distance of the wire from anything, as defined by the Code. LeRay tested hard hats to prove their protection against greater voltage limits, but admitted that ANSI protection standards were not indicated on the hat, that he had not checked his own hard hat for compliance for standards; that he was not fully aware of those standards when he purchased his hat 30 to 60 days before trial prior to running his own tests; and that he would not expect Wooten to be knowledgeable about the ratings. In written reasons for its reversal of the jury's negligence finding, the trial court considered seven cases involving the issue of power line clearance.[1] In all of the *1147 cases, plaintiffs recovered (some at the appellate level), even where no violation of the Code was found and greater clearance was involved than that in this case. The trial court had no factual disputes or credibility issues to consider. It reversed the jury's decision on the following legal grounds:
1. Gulf owed a legal duty under Louisiana law to construct its sign so as not to endanger the life and safety of others, particularly those required to work on the sign  a duty owed regardless of whether the original placement of the sign may not have violated the Code. Defendant owed a continuing duty as long as the sign remained at the same location.
2. Gulf breached that duty by its substandard conduct regardless of whether the Code was literally violated or not and is therefore negligent. Its negligence is a legal cause of this accident and Wooten's death. No other conclusion could be reasonably reached in this case.
3. LP & L was also negligent and that negligence was a proximate cause of Wooten's death.
Duty-risk analysis involves determining whether Gulf's conduct was a cause-in-fact of plaintiff's harm, whether a legal or jurisprudential duty was imposed upon this defendant to protect this plaintiff under the circumstances, whether defendant breached that duty or acted reasonably and whether the risk which resulted in the damages was encompassed within the scope of protection extended by the imposition of that duty. While the causal relation issue involves an analysis of the reasonableness of defendant's conduct as a contributing factor to the harm and the likelihood and gravity of the harm, the duty issue is a policy inquiry into whether the defendant's duty to the victim included protection against the particular injury, that is, the ease of association with this plaintiff under these circumstances. Sibley v. Gifford-Hill & Company, Inc., 475 So.2d 315 (La.1985); decision rendered September 10, 1985); Brock v. New Orleans Public Service, Inc., 433 So.2d 1083, 1086 (La.App. 4th Cir.1983), writ denied, 437 So.2d 1148 (La.1983).
Wooten would not have died but for his head touching a live electrical wire while performing his job. If Gulf had built the sign at a location which had provided more clearance or if LP & L had moved its wire to provide more clearance or if its wire had been de-energized or insulated, this accident would not have happened.
It is well settled that Louisiana courts require a high duty of care by those dealing in the manufacture and distribution of electricity. Electric transmission companies which maintain and employ high power lines are required to exercise the utmost care to reduce hazards to life as far as practicable, and are required to protect against reasonably foreseeable situations. Mere compliance with safety standards does not, per se, relieve the utility of negligence. Insulation by isolation is maintained until something intervenes. Hebert v. Gulf States Utilities Company, 426 So.2d 111, 115, 116 (La.1983). While it is true that Gulf erected its sign after the installation of the wire, both Gulf and LP & L should have and did know that the sign would require maintenance and that the sign's proximity to the wire could foreseeably injure a workman. Both Gulf and LP & L knew the line designed to carry 13.8 kilovolts was uninsulated and presented a grave risk of harm to anyone in close proximity to the line while in contact with the ground or a grounded object. Thibodeaux v. Central Louisiana Electric Company, *1148 428 So.2d 1269, 1271 (La.App. 3rd Cir.1983); writ denied, 433 So.2d 1050 (La.1983).
It is possible that the jury believed that if there were no technical violations of the Code, there was no negligence. However, good engineering practices should be followed regardless of the minimal Code standards or lack of them, as was the case in 1961. A wire insulated by isolation is no longer isolated when a sign beneath it has a negative horizontal and 49-inch vertical clearance.
LP & L had a continuing duty to inspect its lines, yet admitted in answers to interrogatories that none of its employees were designated as inspectors. "Systematic inspection is carried on by all LP & L employees while pursuing their normal job assignments, [with] no report of such inspection... made unless a defect is observed which cannot be promptly corrected." LP & L reported receiving no prior complaints about the height of the wire, nor did any employees or consultants recommend changes in any factors regarding lines in the vicinity of the accident.
For 28 years, Gulf and LP & L allowed a dangerous condition to exist which they controlled and which they could reasonably foresee could gravely harm someone. Therefore, they breached their duty to safeguard the public. The trial court was not clearly wrong in finding that both were liable for Wooten's unfortunate death.

CONTRIBUTORY NEGLIGENCE
The trial court was not clearly wrong when it found that decedent was not guilty of contributory negligence. Contributory negligence is never presumed, but must be proved as any other fact by a preponderance of the evidence. It is well established that when a person is near a known danger, in order to find him contributorily negligent, it must be shown that he voluntarily and unnecessarily exposed himself to the danger. Louisiana jurisprudence holds that it is neither contributory negligence per se nor assumption of the risk to work near electrical power lines, nor do plaintiff's own actions in coming into contact with the line necessarily make him negligent. The issue is whether decedent's conduct was reasonable under the circumstances. The fact that Wooten was aware of the danger and was in fact injured does not preclude recovery if his conduct was reasonable. Esco v. Smith, 468 So.2d 1169, 1174 (La.1985).
While it is not clear who had the responsibility to mitigate the danger to decedent, it is unfair to place the blame for the accident on the "person who poured the last cup of water before the defective dam broke, unless that person exercised a substantial amount of knowledgeable control over the dangerous situation." Esco, 468 So.2d at 1174 [quoting Hall v. Hartford Accident & Indemnity Co., 278 So.2d 795, 799 (La.App. 4th Cir.1973); writ denied, 281 So.2d 753 (La.1973)]. Wooten was following his employer's instructions. Even if he had bought his own safety equipment, electrical engineers testified that it was unlikely he would know what to buy in order to adequately protect himself. Therefore, defendants failed to prove Wooten was either contributorily negligent or chargeable with assumption of the risk.

DAMAGES
After the trial court granted the JNOV, it decided damages issues not reached by the jury.
Dr. Frank Charles DiVincenti, Director, West Jefferson Hospital Burn Unit, in his deposition, described Wooten's condition on admission after transfer from Terrebonne Hospital as totally comatose and unresponsive. He said that neurosurgeon Dr. Carl Culicchea found no neurological function; that Wooten would probably have stopped breathing if the respirator stopped; that the entry point was the top of his head, with exit points on both hands and the anterior of both thighs; that brain death was almost instantaneous; that he probably felt no pain after initial contact; and that death was caused by electrical shock and eventually cardiac arrest four days after the electrocution.
*1149 Since there was no evidence that decedent was conscious at the time assistance arrived or at any time prior to his death, no award was made for physical pain and suffering. A total of $12,525.06 was awarded to plaintiff for the following expenses: Gray Funeral Home, $2,558.14; Pinelawn Memory Gardens, Inc., $1,682.40; West Jefferson Hospital, $7,334.52; Drs. DiVincenti, Robert L. Carter, and Frank A. Rizza, $950.00.
Both plaintiff economics expert Dr. Randy Rice and defense economics expert Dr. Kenneth Boudreaux made similar calculations about Wooten's wage losses from the accident to the time of trial, $14,411.00, and his future work life expectancy, 34½ years. The court accepted as more accurate Boudreaux's projected lifetime wage increase of 3-6%, with a discount factor of 10¾% to Rice's 8% increase and 8½% discount rate. Although Rice calculated decedent's loss of future earnings on a base of both $5.00 and $10.00 an hour, the court held the $5.00 per hour figure to be more accurate.
Wooten's employer described the 22-year-old man as one of the best men he had worked with, as a young man with promise and artistic ability, who was working temporarily with See-More while waiting for an opening handpainting signs with its parent company, Houma Sign Service; that Wooten had worked for an electric sign company previously; and that Wooten's salary may have been raised from $5.00 to $10.00 per hour by the time of trial if he had not died. The court held that the lower figure more accurately reflected decedent's past work history, including the three days he worked for See-More before his death. Plaintiff was awarded a total of $229,174.00 for future lost wages, with two-thirds for her and one-third for her child, with legal interest from date of judicial demand until paid.
The court awarded $100,000.00 to the widow and $50,000.00 to the child for loss of love and affection, with a total award of $279,718.72 in damages for the widow and $126,391.33 for the child. All costs were taxed to defendant, including expert witness fees of $350.00 for Dr. Rice, $350.00 for Elsen, and $250.00 for Dr. DiVincenti.
The trial court's award was not an abuse of its great discretion, and we affirm at Gulf's costs. Reck v. Stevens, 373 So.2d 498 (La.1979).
AFFIRMED.
NOTES
[1] Meche, Tutrix of Meche v. Gulf States Utilities Company, 436 So.2d 538 (La.1983), line 23 feet above ground where plaintiff was raising a television antenna; Hebert v. Gulf States Utilities Company, 426 So.2d 111 (La.1983), 11-foot diagonal clearance; Burley v. Louisiana Power & Light, 319 So.2d 334 (La.1975), write denied, 331 So.2d 455 (La.1976), 332 So.2d 278 (La.1976), 5-foot 7-inch horizontal clearance; Stansbury v. Mayor and Councilmen of Morgan City, 228 La. 880, 84 So.2d 445 (1955); 10-foot clearance but plaintiff was on a ladder; McKowen v. Gulf States Utilities Company, 358 So.2d 675 (La.App. 1st Cir.1978), 22-foot 8½ -inch clearance above water level with 22-foot 4-inch aluminum boat mast; Harper v. New Orleans Public Service Commission, 300 So.2d 546 (La.App. 4th Cir. 1974), write denied, 303 So.2d 182 (La.1974), 8-foot 6-inch diagonal clearance from sign; and Boure v. New Orleans Public Service, Inc., 255 So.2d 776 (La.App. 4th Cir.1971), writ denied, 257 So.2d 432 (La.1972), 90-foot clearance from ground, but 16 feet 8 inches below bridge painter.