565 So.2d 1003 (1990)
Archie Roy SEALS
v.
James R. GOSEY, Jr., M.D., Jorge J. Sanchez, M.D., the Hartford Insurance Company, and Slidell Memorial Hospital (Two Cases).
Nos. 89 CA 0925, 89 CA 1267.
Court of Appeal of Louisiana, First Circuit.
June 26, 1990.
Rehearing Denied August 28, 1990.
*1004 Ray Breland, Bogalusa, for Archie Roy Seals.
Franklin D. Beahm and Katherine B. Muslow, New Orleans, for Jorge Sanchez, Hartford Ins. Co. and James Gosey, Jr.
Randall Champagne, Baton Rouge, for Slidell Memorial Hosp.
Before COVINGTON, C.J., WATKINS, J., and DOHERTY[*], J. Pro Tem.
WATKINS, Judge.
This is a medical malpractice suit wherein the plaintiff, Archie Roy Seals, filed suit against Slidell Memorial Hospital, Dr. James Gosey, Jr., Dr. Jorge J. Sanchez, and The Hartford Insurance Company (Hartford), the medical malpractice insurer for both doctors. The plaintiff alleges that he suffered serious infection and ultimately the amputation of two fingers and a portion of his left hand because the defendants negligently left three pieces of foreign material in his hand after a surgery performed by Dr. Gosey to remove a bullet from his hand. After a four-day jury trial the jury found in favor of all defendants; the trial court thereafter granted plaintiff a judgment notwithstanding the verdict against Dr. Gosey and Hartford as Dr. Gosey's insurer. The court further granted the plaintiff a conditional new trial as to Dr. Gosey and Hartford. We reverse.

FACTS
Plaintiff was shot in the hand on January 25, 1985, during his duties as a compliance officer for the Louisiana Department of Agriculture, Meat Inspection Division. Plaintiff drove himself to the Slidell Memorial Hospital where he subsequently had the bullet removed by Dr. Gosey, the orthopedic surgeon on call that morning. Prior to surgery plaintiff's hand was x-rayed and showed a bullet, which had struck the fourth metacarpal fragmenting a piece of the bone, and several small metallic fragments presumably from the bullet. Dr. Gosey recommended and Mr. Seals consented to a surgical debridement of the gunshot wound. Dr. Gosey, assisted by a surgical technician and an anesthesiologist, prepared Mr. Seals for surgery and placed him under general endotracheal anesthesia. A tourniquet was placed on plaintiff's arm to reduce the blood in the hand, and the remaining blood was absorbed with gauze sponges. Dr. Gosey made an incision 1-1½ inches wide and 3/4 inch deep, removing the bullet and all other detectable material from the wound. Dr. Gosey washed out the wound with a waterpick and betadine and placed the detached piece of bone into its original position. The wound was closed with nylon sutures except for one corner in which Dr. Gosey placed a wick of iodoform gauze for drainage. The wound was then dressed with a 4 × 4 sponge soaked with betadine, cotton padding, and then splints. A sufficient length of the iodoform wick protruded from the bandage so that it could be removed without removing *1005 the bandage. Mr. Seals was placed on antibiotics and remained in the hospital until January 27, 1985. Dr. Jorge Sanchez, an associate of Dr. Gosey, removed the iodoform wick prior to Mr. Seals' discharge.
Plaintiff was seen as an outpatient on February 1, 6, 7, and 12. On February 6, 1985, Dr. Gosey noted routine healing with minimal swelling. The sutures were removed and the wound remained closed with no sign of infection. On February 7, plaintiff saw Dr. Sanchez because he struck his hand and was experiencing pain and swelling. On February 12, the top of plaintiff's hand was swollen with an apparent hematoma presumably from having struck his hand the week before. Dr. Gosey punctured the hematoma with a needle and expressed some of the blood; Dr. Gosey did not detect any pus in the drained fluid, and he did not put anything into the wound. Plaintiff did not return for any subsequent visits.
On February 15, 1985, plaintiff was admitted to the Bogalusa Community Medical Center with complaints of a swollen and tender left hand with drainage. Intravenous antibiotics were administered, as well as warm compresses. On February 16, a gauze-like material was removed from plaintiff's left hand by a nurse while she was wiping some of the drainage from the wound. On February 17, Dr. Hebert removed a small foreign object from plaintiff's left hand. Plaintiff remained in the hospital 14 days, taking IV antibiotics and pain injections. On February 28, plaintiff was transferred to Tulane Medical Center, where he was put on IV antibiotics, and on March 1, he was taken to surgery by Dr. Haddad and Dr. Hontas to incise and drain the left hand. He was thereafter discharged and told to take antibiotics.
On July 25, 1985, plaintiff was admitted to the Bogalusa Community Medical Center and treated by IV antibiotics. On July 28, he was transferred to Tulane Medical Center where he continued on IV antibiotics and underwent a debridement of the exstensor tendons of the third, fourth, and fifth fingers. In December, 1985, he was discharged from care with a 20% partial disability of the hand. However, plaintiff continued to experience pain in his hand and was unable to use it. He was admitted to the Bogalusa hospital for further treatment on January 29, 1986. Dr. John P. Newman, Jr., plaintiff's family doctor, recommended that plaintiff see Dr. Joe Morgan, an orthopedic hand specialist in Baton Rouge. He was admitted to Our Lady of the Lake Hospital, in Baton Rouge, on February 16, 1986. On February 18, plaintiff's fourth finger was amputated because of staph infection. He was discharged on February 23, 1986. Plaintiff's hand continued to give him trouble, and he was admitted to Bogalusa Medical Center on March 17, 1986, for IV antibiotics. He was readmitted to Our Lady of the Lake on March 17, 1986, for infection of the left hand; on March 21, Dr. Morgan performed a debridement and plaintiff was discharged on March 26. Plaintiff's pain persisted and he returned to see Dr. Morgan on April 24, 1986. Thereafter, Dr. Morgan amputated plaintiff's little finger and part of his hand. A culture taken at that time confirmed staph infection.
After trial, a unanimous jury verdict was returned in favor of all defendants. However, after motion by the plaintiff for a judgment notwithstanding the verdict, the trial court granted a JNOV/conditional new trial, overturning the jury verdict in favor of Dr. Gosey. The trial court bifurcated the quantum portion of the award on its own motion, and rendered its quantum judgment four months later, awarding the plaintiff $63,565.00. The damage award was confined to the damages the plaintiff suffered from mid-February, 1985, through his treatment and discharge by Dr. Haddad from Tulane Medical Center in August of 1985.
Defendant, Dr. Gosey, appealed separately the granting of the JNOV and the quantum award. These appeals are now consolidated. Dr. Gosey contends that the trial court erred in entering the JNOV, in substituting its own credibility evaluation and judgment of the facts in lieu of the jury's, in its factual finding that the 100% rayon gauze was introduced into the wound *1006 by Dr. Gosey, in applying res ipsa loquitur, in finding a causal connection between the infection and the two pieces of gauze found in the wound, in finding that regardless of the origin of the gauze Dr. Gosey should have found and removed it, in awarding excessive damages, and in awarding unproven lost earnings and medical expenses. Plaintiff appeals the trial court's quantum award, alleging error in the trial court decision to limit the damages to the time period from February 1985, until August 1985.
The trial court expressed the following oral reasons for the granting of the JNOV.
I'm granting a judgment notwithstanding verdict against Dr. Gosey, because to me it is undisputed that Dr. Gosey had an open wound that he made a little more open than it was, cut it to approximately an inch to inch and a half long; it was a small wound and a shallow wound. And he testified that he debrided the wound, cleaned it out and closed it, after which time he observed it until it was closed completely, and yet a few weeks later, gauze came out of that wound. I know there's a lot of testimony about rayon versus cotton and all those things, but it just seems to me that it's an undisputed fact that there was gauze in the wound after it healed over, and the person that closed it up was Dr. Gosey. He only left a little drain in there which Dr. Sanchez pulled out. Dr. Sanchez could not pull out any more than one continuous piece. I find no liability on his part as I already indicated,....
It's undisputed thatyou know, this gauze had to come from somewhere. The last man that had it opened and cleaned it outit was a short wound, not over an inch, inch and a half long, it was a shallow wound; he testified that he cleaned it out and sewed it up; cut away any dead skin and loose flesh or whatever, and sewed it up. We all saw the piece of gauze that came out of there; it was pretty big piece of gauze. It's unbelievable to me that a surgeon would not see that at such time as he cleaned it out, so that in my view, it is undisputed that something was left in the wound, and the last man that had it opened was Dr. Gosey, and that the jury should not have concluded that he had no liability whatsoever in this case. And accordingly, it's my intention to try and correct that amount or correct that verdict of the jury and finding no liability on the part of Dr. James R. Gosey, Jr., and to try and give some amount that the Court thinks is appropriate.
The threshold issue for consideration is whether the trial court erred in granting the JNOV against Dr. Gosey. Because the plaintiff did not appeal the denial of the JNOV as to Dr. Sanchez, Hartford, and Slidell Memorial Hospital, the trial court judgment is final as to them.

JUDGMENT NOTWITHSTANDING THE VERDICT
The proper standard for a trial court to follow in granting a JNOV is set forth in Wooten v. Louisiana Power & Light Co., 477 So.2d 1142 (La.App. 1st Cir.1985), where this court applied the following standards as enunciated in Boeing v. Shipman, 411 F.2d 365 (5th Cir.1969):
On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidencenot just that evidence which supports the non-mover's casebut in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. Boeing v. Shipman, 411 F.2d 365, 374 (5th Cir.1969).
Wooten, 477 So.2d at 1144.
We concluded in Wooten that a JNOV should be granted only when the evidence *1007 points so strongly and overwhelmingly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. In applying this standard the court cannot weigh the evidence, pass on the credibility of witnesses, or substitute its judgment of facts for that of the jury. Wooten, 477 So.2d at 1144. It is this court's duty to determine whether the trial court's findings in rendering the JNOV were manifestly erroneous. Wooten, 477 So.2d 1142.
Because the instant case involved the use of the doctrine of res ipsa loquitur,[1] we find the following discussion from the recent decision of Cangelosi v. Our Lady of the Lake Regional Medical Center, on rehearing, 564 So.2d 654 (La.1990), particularly instructive in regard to the plaintiff's burden of proof, the application of res ipsa loquitur and the permissible inferences which may be drawn from the evidence.
In an action to recover damages for injuries allegedly caused by another's negligence, the plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence. Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows that the fact or causation sought to be proved is more probable than not. Thus, the plaintiff in this type of action must produce evidence from which the factfinder can reasonably conclude that his injuries, more probably than not, were caused by the negligence of the particular defendant. The plaintiff, however, does not have to conclusively exclude all other possible explanations for his injuries, because the standard is not proof beyond a reasonable doubt. Placing the burden of proof on the plaintiff requires him ultimately to persuade the factfinder concerning the defendant's negligence, and if the fact finder is undecided after all the evidence has been presented, the plaintiff loses because of the failure of his evidence.
. . . . .
Negligence on the part of the defendant may be proved by circumstantial evidence alone when that evidence establishes, more probably than not, that the injury was of a kind which ordinarily does not occur in the absence of negligence, that the conduct of the plaintiff or of a third person was sufficiently eliminated by the evidence as a more probable cause of the injury, and that the indicated negligence was within the scope of the defendant's duty to the plaintiff. Although the fact that an accident has occurred does not alone raise a presumption of the defendant's negligence, the doctrine of res ipsa loquitur (the thing speaks for itself) permits the inference of negligence on the part of the defendant from the circumstances surrounding the injury. The doctrine of res ipsa loquitur involves the simple matter of a plaintiff's using circumstantial evidence to meet the burden of proof by a preponderance of the evidence. The doctrine merely assists the plaintiff in presenting a prima facie case of negligence when direct evidence is not available. The doctrine permits, but does not require, the trier of fact to infer negligence from the circumstances of the event.
In order to utilize the doctrine of res ipsa loquitur the plaintiff must establish a foundation of facts on which the doctrine may be applied. The injury must be of the type which does not ordinarily *1008 occur in the absence of negligence. In other words, "the event must be such that in light of ordinary experience it gives rise to an inference that someone must have been negligent". The basis on which this conclusion is drawn is usually knowledge common to the community as a whole, although in cases such as medical malpractice expert testimony may be used to establish this principle. The plaintiff does not have to eliminate all other possible causes or inferences, but must present evidence which indicates at least a probability that the injury would not have occurred without negligence.
The facts established by plaintiff must also reasonably permit the jury to discount other possible causes and to conclude it was more likely than not that the defendant's negligence caused the injury. Again, the plaintiff does not have to eliminate completely all other possible causes, but should sufficiently exclude the inference of his own responsibility or the responsibility of others besides the defendant in causing the accident. The inference of negligence points to the defendant when the conduct of others is eliminated as a more probable cause. The plaintiff must show not only that an accident occurred or that the accident was caused by the negligence of someone, but also that the circumstances warrant an inference of defendant's negligence.
The plaintiff must also establish that the defendant's negligence indicated by the evidence falls within the scope of his duty to the plaintiff. This is often, but not necessarily, proved by a showing that the defendant was in exclusive control of the injury-causing instrumentality.
Use of the doctrine of res ipsa loquitur in a negligence case, as in any case involving circumstantial evidence, does not relieve the plaintiff of the ultimate burden of proving by a preponderance of the evidence all of the elements necessary for recovery. When all the evidence is in, the question for the jury is whether the preponderance of the evidence is with the plaintiff. (Citations omitted.) (Footnotes omitted.)
Cangelosi, 564 So.2d at 664-666.
In evaluating the decision of the trial court based on the principles enunciated hereinabove, we must remain mindful of the paramount role of the jury in the decision making process. The role of the jury and the extent of the inferences which it may draw from the evidence are further explained in Rougeau v. Commercial Union Ins. Co., 432 So.2d 1162 (La.App. 3d Cir.), writ denied, 437 So.2d 1149 (La.1983), wherein the court stated:
The party against whom a motion for judgment notwithstanding the verdict is made must be given the benefit of every legitimate and reasonable inference that can be drawn from the evidence by the jury. However, the court is not bound by inferences which are unreasonable.
`It is the province of the jury to resolve conflicting inferences from circumstantial evidence, but permissible inferences must still be within the range of reasonable probability. It is the duty of the court to withdraw a case from the jury when a necessary inference is so tenuous that it rests merely upon speculation and conjecture.' Ford Motor Co. v. McDavid, 259 F.2d 261, 266 (4th Cir.1958), cert. denied, [358 U.S. 908], 79 S.Ct. 234 [3 L.Ed.2d 229].
There is no bright line which enables the court to distinguish between the reasonable, legitimate inference and the unreasonable, illegitimate inference. There is no precise rule to follow. The court can only test the reasonableness of the inferences drawn by jury from the evidence in terms of probability. An inference is legitimate only where the evidence offered makes the existence of the fact to be inferred more probable than not. Any lesser test would allow the jury to rest a verdict on speculation or conjecture.
Rougeau, 437 So.2d at 1167.
At the trial of the malpractice action plaintiff argued that the only opportunity for the introduction of the foreign materials was at the time of the surgery performed by Dr. Gosey. Plaintiff contended *1009 that from the time of the surgery on January 25, 1985, until the time of the discovery of the foreign material, the wound was closed; because there was no opportunity for the introduction of the foreign material into the wound, it had to have been placed there by Dr. Gosey.
Dr. Gosey's primary defense of the plaintiff's claim was that the foreign materials removed from the plaintiff's hand were composed of 100% rayon and that Slidell Memorial Hospital did not use rayon gauze in its operating rooms; therefore, he could not have been responsible for leaving the rayon gauze in the plaintiff's wound. Dr. Gosey also contended that there were other plausible explanations of how the foreign material got into the plaintiff's hand between the time of the surgery and the discovery of the material, and that the plaintiff was not under his control during this time. The defendant also presented evidence to establish that infections of gun shot wounds, especially where bone is fractured, are very common even in the absence of substandard care, and that sterile gauze left in a wound does not in and of itself cause infection.[2]
The evidence at trial established that after the surgery was performed, the wound was sutured, with the exception of a small portion, to permit the placement of an iodoform wick, a long thin strip of cotton gauze used for packing wounds. The wound was thereafter bandaged. Two days after surgery the wick was removed by pulling the exposed end of the strip from the wound. On February 1, 1985, the bandage was removed and replaced with a leather brace. On February 6, Dr. Gosey removed the sutures from the wound which had completely closed. On February 7, the plaintiff contacted Dr. Gosey's office complaining that his hand was swollen and painful after he struck it on the side of a table. He was seen that day by Dr. Sanchez who x-rayed the hand and gave the plaintiff a prescription for pain. On February 12, Dr. Gosey noted "a little open wound of the dorsa of the hand" and a hematoma which he attributed to Mr. Seals' striking the hand the week before. Dr. Gosey punctured the hematoma with a needle and evacuated it. On February 15, plaintiff saw Dr. Hebert in Bogalusa with pain, swelling and drainage in his hand. Dr. Hebert testified that when he first saw Mr. Seals on February 15, the wound was approximately one inch wide and there was a ¼ inch opening with drainage. Doctor Hebert admitted plaintiff to Bogalusa Medical Center and ordered intravenous antibiotics and warm compresses to be applied to plaintiff's hand. On February 16, Geneva Penix, plaintiff's attending nurse, was wiping the plaintiff's wound in order to clean the drainage when a piece of foreign material came loose from the wound. She was able to completely remove the foreign material by merely wiping the exterior of the wound. Nurse Penix testified that when she removed the foreign material, the wound opening in plaintiff's hand was the size of a pencil lead and that the material "came out of that little hole." The following day, February 17, Dr. Hebert removed a piece of foreign material from the wound with a pair of tweezers. Dr. Hebert testified that he did not open the wound further to remove the material. The plaintiff testified that Ellen Knight, another attending nurse, also removed a foreign material, resembling threads, from his hand. Plaintiff and his wife, an employee of Bogalusa Medical Center, testified that they did not treat or bandage the wound between January 25 and February 15.
The two gauze-like foreign materials were forwarded to Dr. Paul D. Gard, Jr., the pathologist on staff at Bogalusa Medical Center. Dr. Gard made a comparison analysis of the gauze-like foreign materials, comparing them to 4 × 4 gauze and an iodoform gauze strip which were commonly used in operating rooms. He concluded that the specimens were dissimilar. Dr. Gard made no analysis of the fiber content of the foreign materials. Dr. Irving Stone, an expert in forensic science, conducted a *1010 laboratory analysis of the fiber content of all three foreign materials. The analysis revealed that the two pieces of gauze-like material were composed of 100% rayon fibers and the thread-like fibers were 100% cotton. Dr. Stone also compared all the materials to iodoform gauze wick and Topper bandages and concluded that the materials were not the same. Dr. Stone was also asked to compare the foreign materials with a Johnson & Johnson general use gauze sponge. Dr. Stone noted that the packaging of the general use sponge indicated that the sponges were composed of rayon and polyester; therefore, he concluded that they were different from the foreign materials which were 100% rayon and 100% cotton. Dr. Stone also tested the materials for blood and found that the larger gauze-like material tested positive for blood and that the thread fibers tested negative for any blood. The smaller gauze-like material was not tested.
The plaintiff's medical expert, Dr. Martin Louis Bell, testified that in his opinion the most likely source of the foreign material was a Topper dressing sponge. He reasoned that the foreign material most probably came from a Topper because rayon and cotton were found in the wound. He admitted that Toppers are ordinarily used as a topical bandage and not for cleaning out a wound. He also admitted that he has never had a iodoform wick or Ray Tec sponge tear or fall apart.
Dr. Gosey testified that during the plaintiff's surgery he used only 4 × 4 Ray Tec sponges and iodoform wick in the wound. He presumed that both of these materials were 100% cotton. Dr. Gosey explained that the supplies he used during surgery were the ones supplied by the hospital. He did not specifically ask for cotton 4 × 4's; however, he assumed that they were 100% cotton. Dr. Gosey further explained that he did not use Topper sponges in surgery because they are dressing sponges which are used on top of the wound and not for packing the wound. Dr. Gosey also explained that Ray Tec sponges are used in surgery because of the blue filament in the sponge which shows up on an x-ray. This provides a way of detecting sponges which are inadvertently left in a patient.
Nurse Sharon Hollier, the assisting surgical technician, testified that Ray Tec 4 × 4's and iodoform wick were the materials used during plaintiff's surgery. The hospital records also indicated that a sponge count was made and that all sponges used in plaintiff's surgery were accounted for. Ms. Hollier testified that Dr. Gosey did not cut sponges during surgery. She also stated that she never had a problem with 4 × 4's, or lap sponges, tearing.
Tara Allain, the supervisor of surgery at Slidell Memorial Hospital in 1985, testified that she was in charge of the operating room supplies and that she would stock the operating room with whatever supplies the doctor would order. Ms. Allain also testified that in her nursing experience surgical doctors use only Ray Tec and lap sponges in surgery. However, she stated that lap sponges are extremely large and are generally used only for abdominal surgery because of the large amount of blood involved. Ms. Allain was not familiar with the use of Toppers in surgery and stated that to her knowledge they were not used in the Slidell Memorial Hospital operating room. She also stated that Ray Tecs and lap sponges are never cut.
The medical experts unanimously testified that sterile gauze will not itself cause an infection but that it can be a nesting place for an infection to grow. The majority of the experts also agreed that if the foreign material was in the wound prior to surgery, Dr. Gosey did not breach any duty by failing to find and remove it during the surgery. On the other hand, if Dr. Gosey did introduce the foreign material into the wound, it was a breach of the standard of care to leave it in the wound.
The trial court's granting of the JNOV is based solely on its factual determination that it was more probable than not that Dr. Gosey was responsible for the gauze being in the plaintiff's wound. The legal issues are not in dispute.[3] Because the instant *1011 case involves purely circumstantial evidence and the jury was correctly instructed that it could apply the doctrine of res ipsa loquitur,[4] we must keep in mind the standard by which we must evaluate the jury's decision: whether, viewing the evidence in the light most favorable to the defendant, the inferences drawn by the jury from all the evidence is within the range of reasonable probability and not based merely upon speculation and conjecture. Rougeau, 432 So.2d 1162.
The three pieces of material removed from the plaintiff's hand, as shown on Appendix 1 attached to this opinion, are small and irregular in size; the evidence established that in order for them to have come from a surgical sponge, Topper bandage, or iodoform wick, they would have to have been cut or torn from a larger, standard-sized sponge, Topper, or iodoform wick. The medical experts and witnesses unanimously testified that in their experience they never had a piece of gauze from a sponge or iodoform gauze wick disintegrate or tear. The testimony also established that it would be highly irregular and unnecessary for a surgeon, while performing surgery, to tear or cut a piece of gauze the size of the foreign materials for use in surgery.
Although the plaintiff attempted to establish that the foreign material came from either a Topper bandage or some type of surgical gauze, the comparison analysis made by Drs. Gard and Stone both confirmed that the gauze-like material found in plaintiff's hand was not the same material as a 4 × 4 Ray Tec sponge, a 4 × 4 general use sponge, iodoform gauze wick or Topper bandage.
The evidence shows that plaintiff had an open wound for several hours prior to surgery and that after the wound healed, it reopened sometime between February 12, 1985, and February 15, the date plaintiff entered the Bogalusa hospital. The majority of the medical experts agreed that if the foreign materials were in plaintiff's hand prior to surgery, Dr. Gosey's failure to find and remove them was not substandard care. However, all the experts agreed that if in fact Dr. Gosey was responsible for the introduction of the foreign materials into plaintiff's hand, the failure to remove them would be substandard care.
After reviewing the evidence we find that reasonable and fair minded men in the exercise of impartial judgment may have reasonably concluded that the defendant was not responsible for the foreign material being in the plaintiff's hand. The trial court's determination that reasonable minds could not differ on this issue was error.[5]
Because we have reversed the judgment granting JNOV, we now address whether the trial court properly granted the plaintiff a conditional new trial. LSA-C.C.P. art. 1811 C.(2) specifically authorizes such conditional new trials; however, it also recognizes at the same time our appellate authority to modify such orders as the case may require. LSA-C.C.P. art. 1972 provides that:
A new trial shall be granted, upon contradictory motion of any party, in the following cases:
(1) When the verdict or judgment appears clearly contrary to the law and the evidence.
(2) When the party has discovered, since the trial, evidence important to the cause which he could not, with due diligence, have obtained before or during the trial.

*1012 (3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.
The trial court granted the plaintiff a conditional new trial based on its finding that the jury verdict was contrary to the law and evidence. No other grounds were urged in the plaintiff's motion for new trial, nor did the court state any other grounds for the granting of the new trial. Because we find that the jury verdict was not contrary to the law and the evidence, we reverse the trial court judgment granting a conditional new trial.
For the reasons set forth herein the trial court's judgment granting plaintiff a judgment notwithstanding the verdict and a conditional new trial are reversed, and the jury verdict in favor of the defendant, Dr. Gosey, is thereby reinstated. All costs to be paid by the plaintiff.
REVERSED.

NOTES
[*] Judge Lewis S. Doherty, III, retired, is seving as judge pro tem by special appointment of the Louisiana Supreme Court to fill the vacancy created by the temporary appointment of Judge Melvin A. Shortess to the Supreme Court.
[1] We note that in the recent decision of Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654 (1990), on rehearing, the Louisiana Supreme Court held that the standard to be applied by the trial judge in deciding whether to instruct the jury on res ipsa loquitur is the same standard used in deciding whether to grant a directed verdict or a JNOV, namely, "whether the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable men could not arrive at a contrary verdict. If reasonable minds could reach different conclusions on whether the defendant's negligence caused the plaintiff's injury, then the judge must present the issue to the jury and instruct the jury on the doctrine of res ipsa loquitur." Cangelosi, 564 So.2d at 667. Based on the record before us we find that the trial court was correct in giving the res ipsa loquitur instruction and the instruction itself, which permitted the jury to infer negligence, was correct.
[2] The defendant also established the plaintiff's propensity for infections through the plaintiff's family doctor, Dr. John P. Newman, Jr., who testified that the plaintiff was prone to infections and had a long history of infections.
[3] The evidence clearly established that the failure to remove a surgical sponge is substandard conduct. See also Druilhet v. Comeaux, 317 So.2d 270 (La.App. 3d Cir.), writ denied 321 So.2d 363 (La.1975). Furthermore, the medical experts all agreed that although sterile gauze does not cause an infection, it can provide a nesting place for bacterial growth, thus worsening an existing infection.
[4] See Footnote 1 supra.
[5] We note that the three medical doctors who composed the medical review panel also testified in the instant case with Dr. Luis F. Matta and Dr. Daniel Sterling Sinclair, concluding that Dr. Gosey was not negligent; Dr. Stuart Philips concluded that the case involved a factual issue of whether the material found in the plaintiff's hand was surgical or some other material that perhaps the bullet brought in.